Madden, Judge,
delivered the opinion of the court:
These are suits brought pursuant to Section 13 (b) of the Contract Settlement Act of 1944. The plaintiffs seek to recover money to which they claim they were entitled upon the termination, by the Government, of certain contracts which the Government had entered into with the partnership of Leyde & Leyde, and which, while only partially completed, were terminated. In case No. 49688 Glen W. Leyde sues as the surviving partner of the original contracting firm. His suit relates to one contract. In case No. 49687 Arlington Trust Company, hereinafter called Arlington, sues as assignee of Leyde & Leyde of the partnership’s rights under four other contracts. Glen W. Leyde was, during the existence of the partnership, its manager, and, upon the death of the other partner, his wife, in 1948, became the owner of the partnership’s assets. The name Leyde, as used hereinafter, will refer to the partnership, or to Glen W. Leyde, as the context indicates.
The four contracts upon which the Arlington suit is based were made by the United States Maritime Commission with Leyde & Leyde on April 19,1945. They were officially designated as MCc 38104, 38105, 38106 and 38107. These con *254 tracts were for the construction of 391 reversible life rafts. The fifth contract, on which Leyde’s suit is based, was also with the Maritime Commission, was dated June 16, 1945, and was for 175 life rafts.
On May 1,1945, Leyde & Leyde assigned to Arlington all of its rights to the money which would become due to it from the Government under the four contracts of April 19, 1945. These assignments were made pursuant to the Assignment of Claims Act of 1940, 54 Stat. 1029, 31 IT. S. C. 203. Arlington gave the necessary notices of these assignments to the Maritime Commission and to the General Accounting Office. Leyde & Leyde did not assign the fifth contract to Arlington.
On April 20, 1945, Leyde subcontracted to Gordon and Company of Manteo, North Carolina, the manufacture of 100 of the life rafts covered by the first two of its contracts, with the privilege of enlarging the subcontract to include all of the 256 rafts covered by the first two contracts. On or about May 2, 1945, Leyde subcontracted to Barry Manufacturing Company of New York City the manufacture of 152 of the rafts covered by Leyde’s contracts with the Maritime Commission.
The Government’s contracts with Leyde reserved to the Government the privilege of termination. The first four contracts were terminated by telegraphic notices on August 20, 21 and 22, 1945. Leyde immediately notified the subcontractors, Gordon and Barry, of the terminations. At the time of termination, Gordon had completed 84 rafts and Barry had completed 40. Leyde’s unassigned contract No. WSA-9909 was terminated by the Government on September 5, 1945.
The Office of Contract Settlement, pursuant to the Contract Settlement Act of 1944, 58 Stat. 649, 66 Stat. 627,41U. S. C. 101, issued Regulation No. 8 as authorized by section 4 (b) of the Act, prescribing forms to be used by contractors in presenting termination claims. The objective of the Contract Settlement Act is, of course, to enable contractors with the Government who have expended money in connection with their contracts, and who have not been permitted to recover that money by completing their contracts and getting *255 paid for the completed product, to recover the money spent, together with a reasonable profit. In filing a termination claim, a contractor could ask for an immediate partial payment to be made to him without waiting for a complete audit of his claim.
On October 26,1945, Leyde filed termination claims under the first four contracts totaling $66,862.42, and asking for partial payments amounting to $40,000, and a claim under the fifth contract, No. WSA-9909, asking for $32,906.99, and for a partial payment of $25,000. Leyde included a separate termination claim for Gordon, and in November, a separate claim for Barry. There was also a separate termination claim for an alleged subcontractor called Potomac Enterprises, Inc. Further mention of Potomac will be made hereinafter.
On November 7,1945, the Maritime Commission approved a partial payment to Leyde of $19,000 on the termination claim on the fifth contract, and that payment was made to Leyde in December. In January, 1946, the Commission audited Leyde’s claims and found Leyde’s records to be in poor condition and incomplete. In 1946 Leyde addressed several inquiries to the Commission asking for final settlement of the claims of Leyde and Potomac. On November 29, 1946, the Commission’s Settlement Eeview Board, having been requested to do so by Leyde, made findings on the termination claims under all five contracts, but not on the subcontractors’ claims, which, as to the subcontractors other than Potomac, were being settled by the Commission directly with the subcontractors. The Board’s ultimate finding was that, as a result of the partial payment of $19,000 made to Leyde and referred to above, Leyde was indebted to the Commission in the amount of $8,296.57.
On December 26, 1946, Leyde filed an appeal from the Settlement Eeview Board to the Commission. Extensive hearings were held in February and March 1947 by the Commission’s Findings Appeal Board. On March 31, 1947, before the Appeal Board had made a recommendation, the Commission wrote Leyde’s attorneys that the findings appealed from had been set aside and the Appeal Board would make no recommendation pending a determination by the *256 Department of Justice “upon both the criminal and civil fraud phases of the claims of Leyde & Leyde.” The Commission referred to the Regulations which provided for such action.
In July 1947, Glen W. Leyde was indicted for violation of the False Claims Statute, 18 U. S. C. 80, 1940 ed., in the presentation, in October 1945 of the termination claims on all five contracts. After a trial he was acquitted on January 30, 1948. In May 1948, the United States instituted civil forfeiture proceedings under section 19 of the Contract Settlement Act of 1944, supra, against Glen W. Leyde, his wife, and the partnership of Leyde & Leyde, in the United States District Court for the District of Maryland. The basis of the suit was the presentation of the termination claims in October 1945. The suit by the Government was for damages and penalties. There was a long trial and the District Court in March 1950 rendered a detailed written decision. United States v. Leyde & Leyde, 89 F. Supp. 256. The court found that items amounting to $15,155.64 in the subcontractor claim of Potomac Enterprises filed by Leyde were fraudulent and judgment was entered for one-fourth of that amount plus $2,000, plus costs, a total of $7,066.61. As to the alleged fraud in the other termination claims, the court held that it had not been proved.
On June 14, 1950, Arlington filed its suit in this court as the assignee of Leyde of the first four contracts, and Leyde filed his suit as the owner of the fifth contract, No. WSA-9909. Arlington sues for $79,073.63 plus interest, and Leyde sues for $18,013.40 plus interest.
On August 4, 1950, the Division of Claims, Maritime Administration of the Department of Commerce, the successor of the Maritime Commission, wrote Leyde enclosing findings on the termination claims, which findings were identical with those made on November 29, 1946, and set aside by the Maritime Commission on March 25, 1947.
In Arlington’s suit, the Government made a motion for summary judgment, based on the District Court’s adjudication that Leyde had filed a fraudulent claim. We held that Leyde’s fraud would not work a forfeiture of the rights of his assignee. Arlington Trust Co. v. United States, 121 C. Cls. *257 32. The Government made a second motion for summary-judgment, on the ground that the petition was not timely filed. That motion was denied, 124 C. Cls. 309.
In Leyde’s suit, the Government filed a counterclaim for $18,390.81 plus interest, based upon an alleged overpayment by the Maritime Commission on Leyde’s termination claim under the fifth contract, WSA-9909.
The Government has not entered a plea of fraud in these cases, but in the trial of the cases, and in its brief and argument it urges that many items of the claims were fraudulent. So far as fraud as a ground for forfeiture of even valid items of the claims, because of the fraudulent nature of other items, is concerned, that issue has been adjudicated. In the District Court suit discussed above, the Government charged Leyde with fraud in regard to all the claims. The court decided as we have recited above. The same issue, between the same parties, in a civil suit, was adjudicated, and will not be re-adjudicated in this case. This is not to say that in determining the merits of the items of the claims we will close our eyes to the fact that Mr. Leyde, who prepared and presented the claims which were adjudicated fraudulent, is the same individual who prepared and presented the claims here sued on, and was the principal witness in support of the claims. It would be a mistake to base conclusions upon his testimony, if the other facts and circumstances point in another direction.
There are a number of items in the claims which still involve supposed transactions between Leyde and Potomac Enterprises. In these transactions Potomac is supposed to have acquired materials from suppliers and resold them to Leyde at increased prices, and the increased prices are stated in the claims as Leyde’s costs. Potomac was' adjudicated “false, fictitious and fraudulent” by the District Court and we have found it to be nothing more than another name for Leyde. We disregard all these wash transactions and will not discuss them further. The inflations represented by them should have been eliminated from the petitions in these cases.
The parties are in disagreement as to whether certain expenditures which were included in the termination claims *258 under the heading “Indirect factory expense,” and are called, in Arlington’s suit, “Experimental and research expense,” are properly chargeable to the Government, upon the termination of the contracts.
The findings of the Maritime Commission’s Settlement Eeview Board, later set aside and still later re-adopted, as recited above, rejected Leyde’s claims for experimental work, research, engineering and development because the expenditures were made
many months before the prime contracts were entered into, were not incurred in preparing to operate specially under the terminated prime contracts or under these or other war production contracts.
It is true that the claimed expenditures were made before the contracts were entered into, which was on April 19,1945. Early in 1944 Leyde learned that the Maritime Commission was about to increase its procurement of life rafts complying with Coast Guard specifications. Leyde thereupon devoted the balance of 1944 and the first 3y2 months of 1945 to the development of a self-righting, self-bailing raft. He made bids to the Commission in September 1944 and February 1945 which were not accepted. During the period of experimentation Leyde designed five test rafts of various types which were constructed for him by other persons, Leyde having no raft-manufacturing facilities.
The Maritime Commission would buy only rafts the designs of which were approved by the Coast Guard. On October 7, 1944, the Coast Guard gave written approval to Leyde’s design for one type of raft, and on February 20, 1945, to his design for an improved type. On February 19, 1945, the Commission issued an invitation to bid on 691 life rafts, with specifications which would have been met by either of Leyde’s designs. The invitation required that bids be accompanied by written evidence of Coast Guard approval.
Leyde arranged for subcontracting the manufacture, if he obtained a contract, and submitted a bid on March 1, 1945. As we have seen, Leyde was awarded four contracts on April 19, 1945, and the fifth one on June 16, 1945.
*259 We think that Leyde’s experimental expenses in 1944 and the early months of 1945 were not properly includible in the termination claim. He was experimenting to develop a raft which the Commission would be willing to buy, if the price was right. He had no contract, nor promise of a contract. If his bid had not been finally accepted, he would not, of course, have had any way of recouping his experimental expenses from the Government. When he incurred the expenses, he was speculating on being able, at some time, to sell his product to someone, probably the Government, for enough to repay his development costs and give him a profit.
The termination regulations, which are quoted in our findings, are not clear, at least to persons not skilled in accounting. We suppose that the officers in the Maritime Commission applied the same rule to Leyde that they applied to all other contractors similarly situated. We have been cited to no decision, administrative or judicial, to the effect that expenses incurred before the making of a war contract are reimbursable as termination expenses. It would be remarkable, as the Government urges in its brief, if one received a war contract which included a termination clause, on one day, and the war ended the next day and the contract was terminated, and the contractor had not made a single move or expenditure under the contract, but the Government already owed him a large sum of money which he had expended in experimentation before he received the contract. One looks in vain for a distinction between his position and that of all the other bidders who did not get the contract, but who had spent as much on experimentation as he spent.
Settlement expenses as proved, but not including those incurred in the appeal proceeding, may be included in the judgments.
Arlington, in its suit, asks for $9,800 as “interest on borrowings” down to June 1, 1949, and for such additional amount as shall accumulate to the date of final payment. Since Arlington’s rights are only derivative rights which it must trace through Leyde, it cannot, of course, recover anything which would not, in the absence of the assignment, be recoverable by Leyde. The interest which Leyde actually paid for money borrowed to finance the contracts during the *260 contract period has already been included under the item “General and Administrative Expense.” Arlington will get credit for that. The interest claimed and now under consideration is the interest on four notes which are still unpaid, as follows:

Date of note or last renewal: Principal amount

January 11, 1946-$20, 000. 00
January 22, 1946_ 21, 921.92
February 9, 1946_ 10, 000. 00
November 18, 1949_ 6, 567. 34
Total outstanding_ 58,489.26
Arlington would have us treat it as the holder in due course of unpaid notes on which the maker is obliged to pay interest until the notes are paid. But the United States was not the maker of the notes. Its only obligation was to pay to Leyde, or to his assignee, his expenses properly chargeable as expenses related to the performance of the terminated contracts. If Leyde borrowed money from Arlington representing that he would use it for contract purposes, but he in fact used the money for other purposes, he would not, of course, thereby acquire any right to any payment from the Government, and Arlington’s right to receive Leyde’s payments from the Government would be the right to receive nothing.
The Joint Termination Regulations, section 553, provided that “a war contractor will not be reimbursed for interest on borrowings * * * to the extent that such interest accrues after the effective date of termination.” If this were not the rule, the contractor could use his money, after termination, for other purposes, and leave the debts, to secure which he had assigned his contracts with the Government, unpaid, and continue to collect interest from the Government as a contract cost. Section 6 (f) of the Contract Settlement Act provides for the payment of interest at 2% percent per annum for the period beginning thirty days after termination and continuing until final payment. This statutory interest is the only interest which Arlington is entitled to recover. It will be computed, not on the basis of Leyde’s notes to Arlington, but on the basis of the amount which Arlington may recover from the Government.
*261 Some matters relating to Leyde’s suit, which is based on Contract No. WSA-9909, deserve discussion. This contract was sublet to the L. D. Reeder Company of San Francisco. Reeder sublet its subcontract to Berkeley Steel Construction Company of Berkeley, California. Leyde had promised to procure or assist Reeder in procuring the life raft equipment which had to be enclosed in each raft when it was delivered. Leyde bought from the Commission and paid for a considerable quantity of such equipment. In July 1945, Berkeley agreed to buy from Leyde a part of this equipment which had cost Leyde $1,473 and Leyde shipped it to Berkeley, which refused to accept delivery. When the Government contract was terminated on September 5, 1945, the equipment was on Berkeley’s premises. Leyde included it in its termination claim. The Commission sold some of it for $455, and destroyed the balance. It credited Leyde with the $455. We think Leyde should have been allowed the rest of the $1,473. It was a proper contract activity for it, in view of its discussions with Reeder, to procure this equipment for its subcontractor, and to ship it when it was ordered. Leyde was not paid for it, and its loss of the equipment and the money arose out of the performance of its contract.
Leyde had similar raft equipment stored at Morgantown, Maryland, which it had bought from the Commission for $1,861.15. Leyde apparently hoped to sell it to one of its subcontractors at a profit, but it had no agreement to do so, and the subcontracts with Gordon and Barry provided that they should furnish their own equipment. Leyde in its termination claim included this equipment as termination inventory. It was not termination inventory since Leyde merely had it for possible resale. The Government then removed it to Government warehouses in Baltimore. When the Commission discovered that it was not properly termination inventory, and that it had been three times overvalued, it offered to return it to Leyde at his shipping expense. We know nothing further about this equipment. Leyde is not entitled to recover for its value.
Styrofoam, a buoyant material manufactured by the Dow Chemical Company, was a principal element in the manufacture of the life rafts covered by Leyde’s contracts. Leyde *262 controlled the procurement of styrofoam because it held War Production Board allocation orders for it. On June 29, 1945, Berkeley ordered 9,800 feet, which would make three carloads, of styrofoam from Leyde to be shipped in carload lots commencing in early July. On July 17 Berkeley wired Leyde to ship one carload August 5, one August 15, and one early in September. Dow shipped one carload July 27, one August 17, and one September 5. On September 5 the Government terminated the contract. On September 11 Berkeley wired Leyde that it would not accept the third carload, but on September 21 it wired that it would accept it if Leyde would pay the freight and all other charges. Leyde wired Berkeley on September 22 that Berkeley should include the freight, storage and handling charges in its termination claim and Leyde would include the styrofoam in its termination claim.
In October 1945, Berkeley requested the Commission’s permission to file its termination claim directly with the Commission instead of through Leyde. This permission was granted. Leyde protested because of Berkeley’s unpaid indebtedness to Leyde. Berkeley filed its termination claim J anuary 15,1946. Its claim did not include any of the three carloads of styrofoam mentioned above, and for which it had not paid Leyde. Leyde reminded the Commission that it had already received a partial payment of $19,000, based largely on the cost of this styrofoam. The Commission advised Leyde that it would consider Leyde’s and Berkeley’s claims together, to insure a just settlement, and that the Berkeley claim did not include the styrofoam. As late as September 1946, Berkeley filed a revised claim with the Commission, and still did not include the styrofoam. About this time the Commission advised Berkeley that it should revise its claim to include the first two carloads of styrofoam, which, the Commission said, belonged to Berkeley. Berkeley then did so, and the Commission then paid Berkeley for it. The Commission then sold the three carloads of styrofoam for $3,500 and credited Leyde with $1,173.55 as the proceeds of the last carload.
Leyde had paid Dow $12,785.19 for the three carloads of styrofoam, and received on its termination claim only the *263 credit of $1,173.55 mentioned above. Berkeley never paid Leyde or anyone else for the two carloads for which the Government paid it.
We think the Commission was wrong in, in effect, forcing this payment on Berkeley, when both Berkeley and Leyde were insisting that it belonged to Leyde, and the Commission knew that Leyde had not been paid by Berkeley for the styro-foam. We are not inclined to examine too closely into the technical location of the title to this property which was, we think in the circumstances, none of the Government’s business. We also think that Leyde was entitled to include the cost of the last carload, in his termination claim, although it might possibly have been justified in refusing to pay Dow for it, because Dow shipped it without first checking with Leyde. The freight charges of $273.74 on the third carload, first paid by Berkeley, and reimbursed to Berkeley by Leyde, are also properly includible in Leyde’s claim.
As shown in finding 74, Leyde has received $913.35 more than the amount of his allowable costs under the fifth contract, WSA-9909.
The Government has filed a counterclaim in the Leyde case, based on the excess of the $19,000 paid to Leyde on December 12, 1945, as a partial payment on its termination claim on this contract, over the amount actually due on the claim. That excess is $913.35, and the Government is entitled to a judgment for that amount on its counterclaim.
The Government has filed a cross claim against Berkeley asking for a judgment against it for the amount paid Berkeley on its termination claim for styrofoam, if the court should hold, as it does, that Leyde should get credit for the styrofoam. The theory of the cross claim is that the payments to Berkeley were made under a mistake of fact, or law, or both, if the payments should not have been made to Berkeley. The cross claim is based upon section 14 of the Contract Settlement Act of 1944,41 U. S. C. 114 (b).
Although Berkeley has not, in its answer, questioned our jurisdiction, we think we do not have jurisdiction. Berkeley is not asserting any claim against the Government, either for the same money sought by Leyde, or for any other money. It has already been paid. If the Government desires to sue *264 Berkeley, it will have to do so in a court which has jurisdiction in such cases. We have concluded that we were wrong in taking jurisdiction over the third party in Central National Bank of Richmond v. United States, 114 C. Cls 390 and 117 C. Cls. 389.
The tabulation in finding 54a shows that, as to the four contracts assigned by Leyde to Arlington, and on which Arlington’s suit is based, the Government paid $5,124.87 more than the amount of the allowable costs.
We now consider the Government’s judgment for $7,066.61, with interest, against Leyde, awarded to it in the District Court fraud case. The Government has filed no plea of setoff or counterclaim in these cases for the amount of this judgment. The Government points out that under our Eule 21 as it was before May 15,1951, the defendant could without special plea ask for a reduction or extinguishment of the plaintiff’s demand by any matter arising out of the same transaction as that sued upon. We think it was not necessary for the Government to plead a setoff. If anything were found to be due Leyde, the setoff would be applied against the amount otherwise due. There being, however, nothing otherwise due Leyde, the setoff would be applied against Arlington, if anything were found to be due Arlington on its assignments. The Assignment of Claims Act of 1940, 31U. S. C. 203, makes express provision that certain agencies of the United States may insert in their contracts a provision that payments to an assignee shall not be subject to reductions or setoffs, and if such a provision is inserted, no setoff arising independently of the contract may be made. The statute provides that, in addition to the named agencies of the Government, any other agency of the Government designated by the President may insert such a provision in its contracts. No such provision was inserted in the Leyde contracts, nor does it appear that the Maritime Commission was authorized by the President to insert such a provision in its contracts. The setoff would, therefore, be made against Arlington, if Arlington were otherwise entitled to recover.
Arlington is not entitled to recover. Its petition will be dismissed. Leyde is not entitled to recover. His petition will be dismissed. The United States is entitled to a judg *265 ment for $913.35 on its counterclaim against Leyde in case No. 49688. The Government’s cross claim against Berkeley is dismissed.
It is so ordered.
Laeamoee, Judge; Whitaker, Judge; Littleton, Judge; and Jones, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Commissioner C. Murray Bernhardt, and the briefs and argument of counsel, makes the following findings of fact:
1. a. Arlington Trust Company, Incorporated (hereinafter referred to as “Arlington”), is a Virginia bank located in Arlington. It sues as assignee of Leyde & Leyde, a husband and wife partnership consisting of Glen W. Leyde and his late wife, Ardis M. Leyde, which had its principal place of business at Falls Church, Virginia. Ardis M. Leyde died in 1948, leaving Glen W. Leyde (hereinafter referred to as “Leyde”) as the sole surviving partner and representative of the alleged partnership bringing suit as plaintiff in one of the two actions reported herewith.
b. In neither of the two reported cases did the defendant affirmatively plead fraud as a defense, although evidence was offered by defendant in support of that theory and defendant’s requested findings are predicated in part on that theory.
2. a. Leyde, a 1934 graduate of the 17. S. Naval Academy, was a civilian employee of the Coast Guard Bureau of Marine Inspection and Navigation for several years prior to 1941, when he resigned to engage in private business as a manufacturer’s broker and agent. Subsequent thereto he designed and received patents on a number of liferafts and items of liferaft equipment. During this period of private endeavor he represented several manufacturers of lifesaving and marine equipment in sales to the government on a commission basis.
b. In 1941 he and his wife organized a business partnership under the name of Leyde & Leyde, an informal and undocumented arrangement whose gross receipts from 1941 through 1944 ranged from $21,000 to $53,000. Mrs. Leyde *266 played a subordinate role in the purported partnership, her duties being to maintain such records as were maintained and to act in a part-time clerical and secretarial capacity.
3. In early 1944 Leyde learned that the Maritime Commission (hereinafter “Commission”) was about to increase its procurement of liferafts complying with Coast Guard specifications. Leyde thereupon devoted the balance of 1944 and the first 3% months of 1945 to the development of a self-righting, self-bailing raft, submitting in September 1944, an unaccepted partnership bid to the Commission for a certain quantity. Further unaccepted bids were made by the partnership to the Commission in February 1945, for self-righting as well as reversible rafts. During this period of design and experimentation Leyde’s business was of a service nature and he had no raft-manufacturing facilities. He designed five test rafts of various types which were constructed by other contractors and tested at places on or near the eastern seaboard.[1]
4. One of the featured components of the Leyde raft was a new, lightweight, buoyant material known as “styrofoam,” a Dow Chemical Company product designed to displace “foamglass,” which had been in general use in liferaft construction. Styrofoam was a new product and in short supply, but Leyde obtained a War Production Board allocation order and a purchase arrangement from Dow.
5. The program of the Commission to procure liferafts was conditioned on the production of designs meeting with Coast Guard approval. Leyde submitted his liferaft designs to the Coast Guard for approval. Under date of October 7, 1944, the Coast Guard approved in writing the Leyde plans for a 20-person, self-righting, self-bailing life-raft using styrofoam as a buoyant material, but its approval was made “subject to the first production model passing all the required tests.” Under date of February 20, 1945, the Coast Guard approved in writing the Leyde plans and drawings for a 20-person, improved type of reversible raft.
6. Shortly after securing the later of the two Coast Guard design approvals as set forth in the preceding finding, Leyde *267 was informed by an authorized Commission representative that, since Leyde had no manufacturing facilities, he would have to sublet to competent subcontractors any prime contracts he might receive. He obtained names of such subcontractors possessing manufacturing facilities from the Smaller War Plants Corporation.
7. On February 19,1945, the Commission issued an invitation to bid on 691 reversible or self-righting liferafts, and directed in the invitation that bids be accompanied by written evidence of final approval by the Coast Guard, a complete and fully equipped raft, and a set of approved drawings. The specifications as written covered both of the Leyde raft designs which had secured Coast Guard approval (finding 5).
8. After first soliciting proposals from subcontractors recommended by the Smaller War Plants Corporation, Leyde & Leyde, on March 1,1945, submitted a bid responsive to the invitation described in the preceding finding for 691 reversible or self-righting rafts incorporating styrofoam. The bid was accompanied by the required drawings and evidence of Coast Guard approval, and provided that the work was to be performed at Mt. Clemens, Michigan, or Houston, Texas. In the bid it was represented that the bidder intended to subcontract 50 percent of the dollar volume of any contract awarded. At the time of submitting the bid Leyde had no manufacturing facilities nor had he inspected the facilities of his potential subcontractors.
9. a. On April 19,1945, the Commission awarded Leyde & Leyde four contracts for the construction and delivery of 391 rafts as follows:

1 These figures include an extra 15 rafts for $19,125 added by Addendum No. 1 on May 24,1945.
These contracts are hereinafter frequently referred to as the “first four contracts,” to distinguish them from the fifth contract, WSA-9909, let on June 16,1945.
*268 b. Time and destination for delivery of completed rafts were specified in the respective contracts (including the additional rafts under Addendum No. 1 to contract MCc-381O~), as follows:

o. The rafts to be constructed under the first four contracts were to be of the reversible type, were to be fully equipped with items described in an attached equipment list, and were to be inspected by the Coast Guard at the manufacturer's plant.
10. a. On April 20, 1945, Leyde & Leyde subcontracted with Gordon and Company of Manteo, North Carolina (hereafter "Gordon"), for the latter to supply 100 fully equipped (except for government-furnished items), reversible-type rafts at a unit price of $1,100 f. o. b., Manteo, with discount terms of 1 percent-lO days, and with an option available to the purchaser until July 1 to increase the order to a maximum of 256 rafts under the same terms. The subcontract was for rafts required under prime contracts MCc-38104 and 38105, required delivery of 16 rafts in May and the balance at the rate of 50 to 100 monthly thereafter, and specified the use of foamglass for buoyancy instead of the styrofoam required in the prime contracts.
b. On May 24, 1945, changes were made to prime contracts MCc-38104 and 38105 by Addendum No. 1, which increased the contract price by $95 per raft if foamglass were used instead of styrofoam (a shortage of styrofoam was anticipated and structural changes necessary if foamglass were substituted) and by $46.45 per raft for deliveries at Elizabeth City, North Carolina, because Manteo was not served by rail.
*269 g. Gordon, obtained Coast Guard approval of its raft on or about May 29,1945.
d. Gordon used styrofoam in the construction of the rafts under its subcontract, and ultimately bought and paid for $9,864.57 worth of styrofoam from and to Dow Chemical Company on orders placed by Leyde & Leyde.
11. a. On or about May 2, 1945, Leyde & Leyde subcontracted with Barry Manufacturing Company, of New York City (hereinafter “Barry”), for the latter to supply 152 fully equipped (except for government-furnished items) reversible-type rafts at a unit price of $1,040 f. o. b., New York City. The subcontract was for rafts under prime contracts MCc-38104 and 38105, set up a delivery schedule reflected in the table appearing in finding 13, and required the use of styrofoam as a buoyant material. The subcontract required Barry to secure Coast Guard approval of completed rafts, provided payments to be made to Barry for completed rafts through the Arlington Trust Company, and provided for reimbursement of costs in the event of prime contract termination. It also provided that if Barry purchased styrofoam from Dow for less than a certain cost, Leyde & Leyde was to be paid the difference.
5. Arlington acknowledged the Barry subcontract and became bound by its share of the obligations thereunder.
g. Addendum No. 1, dated May 24,1945, to prime contracts MCc-38104 and 38105, changed the delivery points for rafts in the prime contracts to Elizabeth City, North Carolina (as related in finding 105), and New York City, thus accommodating the geographical locations of both subcontractors, Gordon and Barry. It also increased the contract price by $95' per raft if foamglass were used in place of styrofoam.
d. The styrofoam used by Barry in the construction of rafts under its subcontract was ordered by Barry directly from Dow, paid for in the amount of $16,051.50 by Barry to Leyde & Leyde, and paid for by the latter to Dow in the amount of $16,183.50.
12. Under the purported date of June 6, 1945, Leyde & Leyde issued to Potomac Enterprises, Inc., of Morgantown, Maryland (hereinafter referred to as “Potomac”), an alleged business organization formed by Leyde under circumstances *270 appearing in detail in findings 41 through 44, a purchase order for 100 rafts fully equipped for $70,000, terms 1 percent — 10 days, net — 30 days, with delivery scheduled f. o. b., Baltimore, Maryland, for 4 rafts in September, 40 each in October and November, and 16 in December. The order was ostensibly accepted by Potomac. Circumstances concerning this order, the Potomac organization, and its eventual termination claim, are set forth in subsequent findings. The order to Potomac for 100 rafts did not specify a particular prime contract, and so related to the requirements under all or any of the first four prime contracts.
13. By the initial Gordon and Barry subcontracts (without considering the Potomac subcontract for 100 rafts referred to in the preceding finding) Leyde & Leyde had made provision up to that time for the performance of its first four prime contracts with the Commission to the following extent:[2]

1 Under the Gordon subcontract Leyde had the right (up to July 1, 1945) to order additional rafts, up to a maximum of 156 additional. Leyde had not exercised this right up to the date of its expiration.,
14. On August 11,1945, Leyde & Leyde subcontracted with Gordon for the latter to supply 100 foamglass rafts in addition to those already on order from Gordon. The new subcontract was for a total of $80,000, f. o. b., Manteo, North Carolina, and carried an option until November 1 for an increase to 135 rafts at the same unit price. Leyde & Leyde was to furnish all equipment for the equipment tank, and styrofoam for the center section of each raft. Gordon was *271 to supply the balance of the required equipment except that which was to be furnished by the Commission. Discount terms of 1 percent — 10 days were provided, and an incentive bonus of $25 per raft was added for accelerated deliveries. The subcontract was designed to fulfill the delivery requirements under prime contract MCc-38107.
ASSIGNMENTS UNDER CONTRACTS
15. On May 1, 1945, Leyde & Leyde executed assignments on each of the first four contracts MCc-38104 — 38107 to Arlington pursuant to the Assignment of Claims Act of 1940. Each assignment transferred to Arlington “all its [i. e., Leyde & Leyde’s] right, title, and interest which it now has or may have in and to the moneys due or to become due from the United States of America or from any agency or department thereof” under the respective contracts, and authorized Arlington “to receive and collect any amount or amounts due or to become due thereunder * * Notice of said assignments to Arlington was acknowledged timely by the Commission and the General Accounting Office on or about May 9,1945.
16. On May 8,1945, Gordon made a similar assignment to the Federal Services Finance Corporation of Washington, D. C., of all moneys due or to become due Gordon from Leyde & Leyde under the subcontract of April 20,1945. On June 28, 1945, Barry made a similar assignment to Peoples Industrial Bank of New York City. In the case of each of these subcontract assignments, notice was duly given to Arlington and Leyde.
TERMINATION OP CONTRACTS
17. Pursuant to provisions of the prime contracts permitting termination of the contracts at the buyer’s option, the Commission notified Leyde & Leyde by telegram on August 20, 1945, terminating contracts MCc-38104 and 38105, effective 12:01 p. m., on August 20 and 21, respectively, and the next day sent a telegram terminating contracts MCc-38106 and 38107, effective 12:01 p. m., on August 22 (contract WSA-9909 was terminated September 5, 1945, see finding 61). Leyde & Leyde notified Gordon and Barry of the *272 termination of their subcontracts. No such notice is in the record as to a formal termination notice by Leyde & Leyde to Potomac of the latter’s subcontract. On September 21 the Commission issued addenda to the prime contracts confirming the terminations. The addenda recited that settlements would be made under Article 13 of the contracts.
18. At the time of termination of the contracts, Barry had completed 40[3] of the 152 rafts in its subcontract, and Gordon had completed 84 of the 100 rafts in its subcontract. No rafts had been commenced or completed by Potomac under its subcontract at this time.
administrative and judicial proceedings prior to instant SUIT
19. a. Eegulation No. 8 of the Office of Contract Settlement, issued pursuant to section 4 (b) of the Contract Settlement Act of 1944, prescribed the use of standard forms as provided in the “Instructions for use of Standard Contract Settlement Proposal Forms,” issued by the Office of Contract Settlement October 1, 1944. The instructions provided in part as follows:
1. Standard Forms Provided. — The Standard Forms are prescribed by the Director of Contract Settlement under the Contract Settlement Act of 1944. They are required to be used by all prime contractors and subcontractors in submitting proposals for settlement of claims under terminated fixed-price war supply contracts. * * *
ifs
OTHER EORMS
7. The other forms are as follows:
(a) Settlement Proposal.
Form 1 — General form, which may be used for any proposal, other than one on the total cost basis, regardless of amount.
Form lb — Total cost basis form, for use only where it is necessary to present the proposal on the total cost basis. This form is not generally distributed but will be provided by any government contracting office on request.
* # * %
*273 SETTLEMENT PROPOSAL
8. Basis of Presenting Proposal. — Form 1 may be used for any settlement proposal, other than one on the total cost basis, regardless of amount. It is designed for presenting proposals on the inventory basis, which should be used wherever practicable. Under this basis the settlement proposal will consist essentially of an inventory of individual items or groups of similar items stated at cost. In those cases where the inventory method is not practicable, contractors may present their proposals on the total cost basis. * * *
* % * # *
10. Interim Proposals. — Normally, a proposal when submitted should cover all elements of the claim, including the contractor’s own charges and settlements with subcontractors. However, proposals may be filed in successive steps covering separate portions of a claim arising from the termination. Except with the approval of the customer or contracting officer, this system of progressive reporting should not be used to present claims covering portions of the contractor’s own costs as they may be determined. Bather, it is intended to enable the contractor to file proposals covering either all his own costs, or his settlements with subcontractors, or his settlement expenses. In submitting an interim proposal, the contractor should complete only those portions of the form applicable to his proposal; for example, in submitting a proposal to cover settlements or proposed settlements with subcontractors, he should fill out, in addition to the boxes at the top of the form, only Schedule F and Item 14, and execute the certificate at the bottom of the form. * * *
b. Pursuant to the authority of section 4 (c) and (e) of the Contract Settlement Act, the Maritime Commission issued General Order 57, Bevised, Title 46-Shipping, Part 298 (10 F. Beg. 2624), which provided:
§ 298.41 Afproved forms. Termination claims under war contracts shall be submitted on copies of the contract settlement forms prescribed by the Director of Contract Settlement on October 13,1944 [9 F. B. 12541], or on such other forms as may hereafter be prescribed by him, and shall be certified in the form prescribed by him.
*274 c. The Joint Termination Begulations revised May 9, 1945 (10 C. F. It., oh. VIII, § 845.523-3, et seq.) ,provided:
§ 845.523-3 Total cost basis. (a) Where the inventory method is not practicable, or will unduly delay settlement, an alternative method of computing the war contractor's own charges may be used. The costs chargeable to the entire contract to date of termination are summarized and a profit allowance, if any, is added. All payments previously made and to be made by the Government for completed units are then deducted. This is known as the "total cost method."
(b) If it is determined that the war contractor would have suffered a loss on the entire contract had it been completed, procedure under the inventory method remains unchanged, but no part of the loss on the completed portion should be included. Under the total cost method, however, the procedure is then as follows: from the total costs of the contract are deducted the payments for completed units adjusted upward to reflect the fact that the indicated cost of these units exceeds their contract price. Thus, if a 6 percent loss on cost were indicated, the contract price of the completed units would represent 94 percent of the indicated cost. By dividing the contract price by .94, the indicated cost of the corn-pleted units can be determined. The deduction of the, higher amount will leave only the estimated cost applicable to the terminated portion of the contract.
(c) This basis may be used in presenting settlement proposals on Short Form la or General Form lb.
§ 845.525-2 Instructions for use of Forms 1 and lb. (a) Form 1 is designed primarily for presenting proposals on the inventory basis, described in § 845.523-2. This basis should be used wherever practicable. * * *
(b) Where the inventory method is not practicable, war contractors may present their proposals on Form lb on a total cost basis described in § 845.523-3. * * * Form lb is not generally distributed but will be provided by any Government contracting office on request.
(c) Normally, proposals submitted on either Form 1 or lb should cover all elements of the termination claim, including the contractor's own charges and settlements with subcontractors. However, to expedite approval and payment, partial proposals covering either all the war contractor's own costs, or his settlements with subcontractors, or his settlement expenses, may be filed separately as they are prepared. Otherwise, the war *275 contractor will not submit portions of bis own costs separately without the approval of the customer or contracting officer.
(d) Where the proposal is submitted on either Form 1 or Form lb, the proposal must be supported by the Termination Inventory Schedules (Forms 2a, 2b, 2c, and 2d) and usually by a Schedule of Accounting Information (Form 3) referred to in §§ 845.522^-4 and 845.522-5.
20. a. On October 26, 1945, Leyde & Leyde filed with the Contract Termination Board of the Maritime Commission termination claims and partial payment applications, prepared by their accountants in reliance on Leyde’s personal representations and meager records, on contracts MCc-38104-38107.[4] Leyde & Leyde claimed $66,862.42 and requested partial payment of $40,000 on the four contracts. Both the termination claims and the accompanying letter referred to the claims as “interim” ones prepared on a total cost basis, although Leyde’s accountant who assisted in the preparation of the claims understood them to be substantially correct and needing only minor adjustments to be final. Leyde executed the claim for Leyde & Leyde as the authorized official of the contractor and certified that the claims of both the prime contractor and subcontractors filed simultaneously were fair and reasonable and were allocable to the terminated portions of the contracts.
&. Included separately with the termination claim of Leyde & Leyde was a termination claim for Gordon as subcontractor in the amount of $29,404.46, relating to contracts MCc-38104, 38105 and 38107. Gordon also, on October 12, 1945, prepared an application to the Commission for a partial payment of $20,000, which Leyde endorsed as to its accuracy. Gordon’s termination claim was later settled by the Commission.
g. Also included in the Leyde & Leyde submission of October 26 was a termination claim and application for partial payment by Potomac, the former marked “interim” and prepared on the total cost basis.
*276 d. In early November 1945, Leyde & Leyde’s claim was revised to include the two termination claims of subcontractor Barry dated October 22, in the amount of $55,042, covering separately Barry’s subcontract for 152 rafts under prime contracts MCc-38104 and 38105, of which number Barry had completed 40. Barry’s termination claim was later settled by the Commission.
21. On November 7,1945, the Commission approved a partial payment to Leyde & Leyde of $19,000 on its termination claim under the fifth contract, WSA-9909 (see footnote 4), and a check was issued to cover on December 12.
22. The Commission performed an audit of the termination claims in January 1946, and found the records of Potomac and Leyde & Leyde to be in poor condition and incomplete. In April, May, and July 1946, Leyde addressed several written inquiries to the Commission seeking final settlement on the claims of Leyde & Leyde and of Potomac. On August 2,1946, the Chief of the Commission’s Contract Settlement and Surplus Materials Division advised Leyde ■of the Commission’s General Order 57, which gave termination claimants the right to demand findings on submitted claims from the Settlement Beview Board.
23. Accordingly, Leyde & Leyde’s attorney requested the Settlement Beview Board on August 14, 1946, to make findings on the termination claims and, on November 29, 1946, the Settlement Beview Board made such findings on the termination claims under all five contracts, including contract WSA-9909, but not as to the subcontractor claims which were being settled directly with the subcontractors.[5] The ultimate finding was that a balance of $8,296.57 was due the Commission as an overpayment, resulting from the $19,000 partial payment made earlier on contract WSA-9909.
24. The findings of the Settlement Beview Board set out separately its determination of items in various categories, noting the amounts allowed and disallowed with the reasons therefor. The effect of the allowances and other determinations are summarized as follows:

*277

To the foregoing amount of $8,296.57, due the Commission, is to be added a penalty of 6 percent per annum on $16,511.22 ($19,000 less $2,488.78) from December 12,1945 (date of partial payment) to the date of repayment of the $8,296.57 to the Commission.
25. a. In. the meantime Leyde & Leyde’s firm of certified public accountants had been preparing final termination claims for filing, although their progress was slow due to the poor condition of Leyde’s records and pressure of other business. On December 27, 1946, Leyde & Leyde filed revised forms of settlement proposals with the Commission prepared on the total cost basis and marked as “final” claims. One of the claims was filed for Potomac purportedly in connection with its subcontract under contracts MCc-38106 and 38107, and the other was for Leyde & Leyde in connection with the four contracts MCc-38104-38107. In covering letters accompanying the revised claims the claimants stated their intention that the revised claims supersede the interim claims filed a year before. Leyde & Leyde’s firm of certified public accountants, which had prepared the revised claims, submitted accompanying letters, each stating that *278 “Because of the lack of and unavailability of certain vouchers, receipts, disbursements and other supporting data, we cannot certify to the correctness of the within settlement proposal.”
b. Each claim form filed bore a certificate signed by Leyde as authorized representative of the contractor, certifying that the claim was prepared from the contractor’s books of account and records in accordance with recognized commercial accounting practices, that it included only costs al-locable to the terminated contract, that it was prepared to use as the basis of a claim against the United States, and that the charges in the claim were fair and reasonable.
26. On January 3, 1947, the Commission acknowledged receipt of the revised claims and refused to give consideration to them because of the findings theretofore made by the Settlement Review Board on the interim claims. The Commission suggested that the claimants could follow the appeal procedure in the Commission’s General Order 57, providing as follows:
§ 298.162 Appeal from -findings. Where a war contractor desires to appeal to the Commission from findings made by the Settlement Review Board, or where regulations of the Director of Contract Settlement require him so to proceed, the war contractor, within the time specified in the war contract or, if not so specified, within thirty days after his receipt of the findings, should address by registered mail a letter so stating to the Secretary of the Commission. The Commission will then consider the protest or appeal of the war contractor and, in appropriate cases, will set a date for hearing thereon either before the Commission or a special board to be designated by it.
27. Just prior to this advice, and on December 26,1946, the claimants had filed an appeal with the Commission to the findings of the Settlement Review Board, and extensive hearings were held in February and March 1947, by the Commission’s Findings Appeal Board. Before a decision was reached on the appeal, Leyde’s attorneys received the following letter from the Commission under date of March 31,1947:
At its meeting on March 25, 1947, the United States Maritime Commission set aside the settlement by deter *279 mination by tibe Contract Settlement and Surplus Materials Division of, and the findings of the Settlement Eeview Board on, the termination claims of your client, Leyde & Leyde, insofar as they applied to the claims of Leyde & Leyde for its own charges and the claim of Potomac Enterprises, Inc. At the same meeting the Commission decided to direct the Findings Appeal Board to make no report to the Commission on the hearing on appeal of Leyde & Leyde from the findings of the Settlement Beview Board on its claims. The Commission also decided that it would take no action upon the claims of Leyde & Leyde pending final determination by the Department of Justice upon both the criminal and civil fraud phases of the claims of Leyde & Leyde, and decided that it would request the Department of Justice to take whatever civil action it considers appropriate with respect to the Leyde & Leyde claims.
The foregoing action by the Commission was based on the fact that there were indications of fraud in the Leyde & Leyde claims, and on the provisions of section 138.2 of the Joint Termination Regulation of the Army and Navy Departments, which serve as a guide to the Commission under the provisions of section 101 of the Commission’s Manual of Instructions for settling termination claims. The relevant provisions of the aforementioned section 138.2 are, in substance, that, in case an officer or employee of the contracting agency has reason to believe that a termination claim is intentionally false or fraudulent, he shall, prior to settlement thereof, take no further action thereon, and that the contracting agency shall transmit the case through the appropriate channels to the Department of Justice for the necessary investigation.
28. In July 1947, Leyde was indicted for violation of the False Claims Statute (18 U. S. C. 80), in the presentation in October 1945, of the termination claims on all five contracts. After a trial he was acquitted on January 30,1948.
29. Immediately upon Leyde’s acquittal in the criminal case his attorneys wrote to the Commission inquiring as to the status of the pending claims, to which the Commission responded refusing to consider the claims further until the Department of Justice finally determined the civil fraud aspects of the case.
30. a. In May 1948, the United States instituted civil forfeiture proceedings (section 19 of Contract Settlement Act of 1944) against Leyde, his wife, and Leyde & Leyde in the *280 United States District Court for the District of Maryland, based on the presentation of the interim termination claims in October 1945. The suit sought to recover damages and penalties.
5. After a protracted trial, in March 1950 the court found no fraud in the claims filed by Leyde & Leyde in its own behalf.[6] The court found that items totaling $15,155.64 in the Potomac claim were fraudulent and judgment was entered for the United States for $5,788.91 (25 percent of $15,155.64, plus $2,000), together with costs of $1,277.70 taxed by the clerk. The judgment has not been paid. No formal plea of setoff pertaining to this amount has been filed by defendant in the instant suit, although defendant asks for a setoff of $7,066.61, plus interest at 6 percent per annum from March 29,1950.
31. During the pendency of the civil forfeiture action in the District Court, Leyde & Leyde’s attorneys again made written demand on the Commission for a determination of the termination claims, but the Commission refused to act until the Department of Justice concluded its fraud proceedings.
32. On June 14, 1950, Arlington filed its petition in this court as assignee of Leyde & Leyde under contracts MCc-38104-38107 seeking recovery of $79,073.63, plus interest on borrowings and statutory interest at 2^4 percent from September 23, 1945. Simultaneously Leyde, as surviving partner of Leyde & Leyde, filed his petition here for recovery under contract WSA-9909. Both suits were largely based on the final termination claims of December 1946, and not on the interim termination claims of October 1945.
33. On August 4, 1950, the Division of Claims, Maritime Administration of the Department of Commerce, wrote Leyde & Leyde with respect to the termination claims as follows:
You will find attached hereto Findings made in connection with your termination claims P-1561 and P-1562,[7] in the amount of $8,296.57, owing and due the *281 Maritime Administration, plus interest at 6% per an-num on the overstatement on claim #P-1562 of $16,511.52 from December 12,1945 (date of partial payment) , to date of repayment of tbe $8,296.57.
The findings which are referred to in the foregoing letter are a verbatim copy of the findings of the Settlement Review Board on November 27, 1946, which were set aside by the Commission on March 25,1947 (findings 23,24,27, 47).
Before examining the items of claim in detail, certain preliminary matters should be inquired into with respect to the acquisition of certain property at Morgantown by Leyde, and the origins and bona fides of Potomac Enterprises, Inc.
THE MORGANTOWN PROPERTY[8]
34. During the period when Leyde was negotiating the prime contracts in this suit he became interested in a waterfront property at Morgantown, Maryland, consisting of 361 acres. Included were a small summer resort with a picnic grove at lower Cedar Point on the Potomac River and 12 to 22 acres of commercial area. The Point, which had a beach area and dock, was also improved by a two-story farmhouse, some small bathhouses, and a larger building once used as a restaurant. The property had a secluded duckpond and had potential utility as a hunting and fishing preserve.
35. On or about May 3,1945, the Leydes made a deposit of $2,000 on purchasing Morgantown at a price of $40,000, with a $2,500 discount offered for full payment by a stipulated date. The Leydes acquired legal title on August 1, 1945.
36. At the time of presenting the interim termination claim, and thereafter, Leyde represented to the Commission representatives, and later to this court in the course of trial, that Morgantown was acquired for the primary purpose of manufacturing liferafts and as a procurement and distribu *282 tion center for materials and equipment in connection with Leyde’s war contracts. Leyde also represented that thereafter he intended to operate Morgantown as a site for commercial operations by Potomac in the manufacture of life-saving and water-sports equipment, as well as to use it for other seashore activities. These representations as to the contract-period use of Morgantown to manufacture rafts were not borne out or supported by the conflicting facts set forth in the following findings.
37. In discussing Morgantown with his raft subcontractors Leyde had expressed his intention to use the property as a beach resort and hunting preserve, but had made no mention of an intention to use it as a site to manufacture rafts. In discussing with his attorney the formation of Potomac in May 1945, Leyde described the object of Potomac would be to operate a summer resort and hunting preserve at Morgan-town, and no mention was made with respect to its use for raft manufacture. He had advised the purchasing agent at the Commission that he had no manufacturing facilities prior to the contract awards.
38. Leyde intended to subcontract to independent subcontractors all of the 391 rafts called for under contracts MCc-38104-38107 and the 175 rafts required by contract WSA-9909. Thus, prior to purchasing Morgantown, he subcontracted 252 rafts to Gordon and Barry, and on August 11, 1945, he subcontracted an additional 135 rafts (including 35 optional) to Gordon, which brought the total number of rafts subcontracted to 387. Although earlier he had subcontracted 100 rafts to Potomac, he had no bona fide intention or prospect of performing this subcontract, and the Gordon subcontract of August 11 for 135 rafts was let to fulfill the same prime contract requirements which Potomac would have been unable to fulfill. Leyde’s negotiations with Keeder and others prior to the award of contract WSA-9909 establish that he had no intention to perform that contract at Morgantown.
39. There is no evidence of any expenditures for a factory or for raft manufacture or supply at Morgantown. No attempt was made by Leyde to establish facilities there or elsewhere for raft manufacture. No personnel was engaged to *283 manufacture rafts at Morgantown. No material or equipment for the manufacture of rafts was ordered for or delivered there with that intention in mind. The existing facilities there were completely inadequate for the manufacture of rafts, and the few improvements that were made were not remotely connected with a conversion of the facilities to raft-manufacturing purposes. The Leydes’ income tax return for 1945 claimed tax deductions for operating Morgantown as a farm, the improvements were claimed to be farm buildings, an operating farm loss was claimed, and a tractor and truck which had been purchased were claimed in the return as farm expense.
40. The evidence conclusively demonstrates that the Mor-gantown property was not acquired for purposes relating to performance of contracts MCc-38104-38107 or WSA-9909, nor were any efforts, made by Leyde during the period of contract performance to adapt Morgantown to such purposes.
POTOMAC ENTERPRISES
41. In May 1945, contemporaneously with Leyde’s acquisition of Morgantown, he discussed with his attorneys the incorporation of an organization to be known as “Potomac Enterprises, Inc.” As stated to his attorneys, the primary purpose of Potomac was to conduct the post-war operation of Morgantown as a beach resort and hunting preserve. Subsidiary purposes were stated to be to have it serve Leyde & Leyde as a purchasing organization in whatever commercial activities Leyde & Leyde might engage, including the raft program, and as a marine railway and repair facility. The evidence does not support any serious purpose on Leyde’s part that Potomac would manufacture liferafts at Morgan-town or elsewhere, despite the raft subcontract awarded Potomac (finding 12).
42. For reasons immaterial to this litigation, the incorporation papers were tardily filed and Potomac did not receive a corporate charter until March 1946. While Potomac was represented by Leyde to government representatives in 1945 and 1946 to be a partnership, there were no written articles of partnership, no record of partnership meetings, no contemporaneous partnership books and records, no separate *284 partnership bank account[9] or other assets, no separate part- ■ nership offices, no partnership manufacturing facilities, and • no provable partners or employees. It was used in some instances as a device to increase the cost of items of direct ■materials expense in the termination claim of Leyde & Leyde ■ by the addition of an extra profit on purported resales from Potomac to Leyde & Leyde. The evidence conclusively ; establishes that Potomac was a fiction or, at best, a mental ■ concept of Leyde. He intended to create such an entity but never effectuated the intention. Its only indicia of separate ■existence during 1945 consisted in the use of its name in several raft-supply transactions, on business stationery, in its • raft subcontract, and in its termination claim. To all practical intents and purposes Leyde and Potomac were indistinguishable alter egos in their relation to the raft contracts, despite efforts at surface dissimulation.
43. As referred to in finding 20 (c) in October 1945 Potomac, through Leyde & Leyde, filed a contract termination claim and an application for partial payment with the Commission claiming $11,930.17 arising from the termination of its subcontract for 100 rafts with Leyde & Leyde, and cancellation of styrofoam orders. Leyde determined the cost items included in the claim, and it was prepared with the help of Leyde’s certified public accountant.
44. The court’s decision in the civil forfeiture case against the Leydes in the District Court found that the subcontractor termination claim filed by Leyde & Leyde for Potomac was “false, fictitious, and fraudulent” and entered a judgment for the United States in the amount stated in finding 30. The finding of the District Court as to Potomac is supported by the record in this case. However, no claim by Potomac is •before this court, except to the extent that the claims before this court are predicated on the interim and final termination *285 claims filed by Leyde & Leyde which originally included claims on behalf of Potomac and other subcontractors.
DETAILS OE PENDING CLAIM
45. Arlington’s instant claim as stated in its petition is for • $79,073.53, plus interest at 2y2 percent per annum, segregated • as follows:
Total costs:
Cost of direct materials_$162,158.12
Experimental and research, expense_ 35,635.01
General and administrative expense_ 14,665.60
Profit- 18, 906. 70
Settlement expense_ 6, 000.00
237,365.43
Interest on borrowings. 9, 800.00
1247,665.43
Total payments. 168,591.80
Amount claimed_ 79,073. 63
1 Patently an error in addition, since the amounts add to $247,165.43, which would reduce the amount of the claim to $78,573.63.
46. The above items (except interest on borrowings) were partially included in Leyde & Leyde’s termination claims of October 1945 and December 1946 (findings 20a and 25) in the following amounts:

1 To be determined.
*286 47. The November 1946 findings of the Settlement Beview Board (findings 23,24), which were set aside in 1947, by the Commission (finding 27), and later adopted by the Department of Commerce in 1950 (finding 33), provided the following explanations for the allowance or disallowance of the various items contained in the contractor’s interim termination claim of October 1945, as to all five contracts:
I. No allowance should be made on account of the claim of Potomac Enterprises, Inc., as a subcontractor of Leyde & Leyde because Potomac Enterprises, Inc., has no legal status separate from Leyde & Leyde.
II. No allowance should be made for the following claimed direct materials because:
A. Under Claim No. P-1561:
1. Units with a contract price of $135,080 were completed by subcontractors and delivered by them to the Commission on behalf of Leyde & Leyde prior to termination, and Leyde & Leyde has been or. will be paid the contract price therefor by the Commission.
2. Inventory consisting of ration sets, $11,016, was undelivered by and the property of the supplier on termination, and was not allocable to the terminated prime contracts because it was not ordered from Leyde & Leyde by any subcontractors who were manufacturers of liferafts.
3. Styrofoam, $660, was properly a part of the termination claim of a subcontractor.
4. Items totaling $1,613.74 were not found in the inventory.
5. Inventory located at Morgantown, Maryland, $12,062.44, was not allocable to the terminated prime contracts because it was not ordered by any subcontractors of Leyde & Leyde who were manufacturers of the liferafts.
B. Under Claim No. P-1562 :
1. Two carloads of styrofoam were properly a part of the termination claim of a second-tier subcontractor, and one carload of styrofoam was the sole responsibility of Leyde & Leyde since it was shipped by the supplier to the subcontractor on order of Leyde & Leyde, contrary to the instructions of the subcontractor., and would have been the basis of no termination claim by the supplier if not so shipped since the supplier would have been able to divert it to other orders without additional cost.
*287 2. Purchased parts, $8,672.51 (items priced at $5,735.55 at Morgantown, Maryland, and items priced at $2,936.9.6 at Berkeley, California) were not alloca-ble to the terminated prime contract because they were not ordered from Leyde & Leyde by any subcontractors who were manufacturers of life rafts.
III. Leyde & Leyde is entitled to a return of the unsold items which are of any value, improperly claimed by Leyde & Leyde to be termination inventory and which were removed by the Commission in reliance on the claim of Leyde & Leyde. (These items are listed in the attached Schedule A.)
IV. Leyde & Leyde is entitled to the sale price received by the Commission, less freight, for materials improperly claimed by Leyde & Leyde to be termination inventory and disposed of by the Commission in reliance on the claim of Leyde & Leyde. (These items are listed in the attached Schedule B.)
V. No credit may be allowed for inventory, improperly claimed by Leyde & Leyde to be termination inventory in Berkeley, California, $2,936.96, which was destroyed by Commission representatives as of no value. (These items are listed on the attached Schedule C.)
VI. No allowance should be made for direct labor because:
A. Under Claim No. P-1561, the alleged payments were not allocable to the terminated prime contracts, or were not adequately supported, or, in the case of the alleged payments to Claude B. Bosenberger, were for services to subcontractors which were paid for by the subcontractors and included in their termination claims.
B. Under Claim No. P-1562, the alleged payment of $1,000 to Claude B. Bosenberger was for services to a second-tier subcontractor which were paid for by that subcontractor and included in its termination claim.
VII. No allowance should be made for claimed indirect factory expense because:
A. Under Claim No. P-1561:
1. Claimed miscellaneous expenses, $1,879.23, constituted payments for personal expenses unconnected with the prime contract work.
2. Claimed expenditures for experimental work, research, engineering, and development, $38,409.16, many months before the prime contracts were entered into, were not incurred m preparing to operate spe-
*288 daily under the terminated prime contracts or under those and other war production contracts.
B. Under Claim No. P-1562, claimed indirect factory expense, $801.99, constituted payments for personal expenses unconnected with the prime contract wbrk.
VIII. .For general and administrative expense allo-cable to the aforementioned terminated prime contracts (prorated between the two claims on'the basis of 69.081 per cent and 30.919 percent, respectively) the following constitutes a fair and reasonable allowance:

IX. The sum of $300 under Claim No. P-1561 and the sum of $25 under Claim No. P-1562 constitute a fair allowance for settlement expenses in view of the fact that there is only a negligible amount of termination inventory allocable to the terminated prime contracts and direct settlement is being effected by the Commission with the subcontractors of Leyde & Leyde.
48. Direct Materials — $16%,158.1%:
This item is detailed in Arlington’s evidence as follows:
Payments to subcontractors:
Barry for 40 completed rafts- $42, 680.00
Gordon for 84 completed rafts_$92,400. 00
Freight_ 3, 898.08
Less: Cash discounts- 961.18
- 95,336.90
- $138,016.90
Materials purchased:
Mar. 26,1945, Styrofoam_ 375,00
Mar. 28, 1945, Foamglass_ 318. 91
Apr. 2,1945, Foamglass mastic_ 10.58
—:- 704.49
Raft equipment in terminal inventory_ 23,436. 73
162,158.12
*289 Payments to subcontractors: Total payments of $138,-016.90 were made by Leyde & Leyde to subcontractors for completed rafts.
Materials 'purchased: These materials totaling $704.49 were bought by Leyde & Leyde from the manufacturers and shipped directly to Gordon for use in performance of its raft subcontract. Since they were not part of the termination inventory of either Leyde & Leyde or Gordon, and since Leyde & Leyde paid Gordon for 84 completed rafts, these materials must have been incorporated in the completed rafts, and allowance of the claim to Leyde & Leyde would duplicate their payment by defendant. Leyde & Leyde’s claim, if any, should be against Gordon, but the record does not indicate that Leyde & Leyde pursued its claim against Gordon.

Baft equipment m terminal inventory:

The final termination claim filed by Leyde & Leyde claimed $23,436.73 for raft equipment in its terminal inventory, $10,-074.63 of which represented purchases of surplus equipment from the Commission and the remaining $13,362.10 from other sources.[10]
Leyde & Leyde actually paid the Commission $4,437.79 for the surplus equipment for which it claimed a cost of $10,-074.63. The difference is explained by Leyde’s assertion, unfounded in fact, that he had bought these items at the larger figure from Potomac, which had acquired them from the Commission at the lower figure.
Of the $13,362.10 representing Leyde & Leyde’s claim for raft equipment in its terminal inventory acquired from sources other than the Commission, only $1,204.36 is allo-cable to the raft contracts. The difference of $12,157.74 com *290 prises $11,016[11] for ration sets, $660[12] for styrofoam, and other items totaling $481.74 not properly chargeable to the raft contracts.[13]
From all the evidence a fair and reasonable determination of the allowable cost of direct materials would be $143,659.05 instead of $162,158.12 as claimed.
49. Experimental and Research Expenses (.Precontract)— $35,635.01:
a. The Statement of Principles for Determination of Costs upon Termination of Government Fixed Price Supply Contracts, approved by the Joint Contract Termination Board on December 31, 1943, made effective by Directive Orders 1 and 2 of the Office of War Mobilization, dated respectively January 8, 1944, and February 24, 1944, and adopted by O. C. S. Regulation No. 5, provided:
1. General principles: The costs contemplated by this statement of principles are those sanctioned by recognized commercial accounting practices and are intended to include the direct and indirect manufacturing, selling, and distribution, administrative, and other costs incurred which are reasonably necessary for the performance of the contract, and are properly allocable or apportionable, under such practices, to the contract (or the part thereof under consideration). The general principles set out in this statement are subject to the application of any special provisions of the contract. Certain costs are specifically described below because of their particular significance, and, as in the case of other costs, should be included to the extent that they are al- *291 locable to or should be apportioned to the contract or the part thereof under consideration.
* * * * *
(d) Experimental and research expense: General experimental and research expense to the extent consistent with an established prewar program, or to the extent related to war purposes.
(e) Engineering and development and special tooling: Costs of engineering and development and of special tooling; provided that the contractor protects any interests of the Government by transfer of title or by other means deemed appropriate by the Government.
Office of Contract Settlement Termination Cost Memorandum No. 10, dated July 26,1945, on Engineering and Development, Special Tooling, and Preparatory Expenses, provided :
1. Reference to Statement of Cost Principles, a. The statement provides for the inclusion of the costs of engineering and development and of special tooling as follows (subpar. 1 (e)):
“Engineering and development and special tooling. Costs of engineering and development and of special tooling; provided that the contractor protects any interests of the Government by transfer of title or by other means deemed appropriate by the Government.”
* * * * *
2. Definition, a. The term “engineering and development,” as used herein, refers to the design of the product, the detailed engineering specifications, the design of special tooling, the planning of production processes and layout, and related functions performed specially for the contract, or the contract and other war production contracts.
# ‡ Hí ‡
c. The term “preparatory expenses” refers to expenses incurred in preparing to operate specially under the contract, or the contract and other war production contracts. It includes the reasonable costs of plant rearrangement and alterations, organization, planning, and similar activities carried on specially for the contract, or the contract and other war production contracts. It does not include special facilities or initial costs, which are the subjects of other cost memorandums (see T. C. M. Nos. 9 and 7).
*292 d. The phrase “other war production contracts,” as used in subparagraphs a, b, and c above, refers only to such war production contracts as were in existence at the time the special tooling was acquired or the costs of engineering and development or preparatory work were incurred; or such contracts as were at that time so certain to be entered into that the costs of this character could reasonably have been incurred for them, as well as for the terminated contract. For purposes of this memorandum, time of acquisition means the date an order was placed or the date of authorization of work or construction by the contractor.
3. Interpretations, a. The basis for the inclusion of costs of engineering and development, special tooling, and preparatory work is the amount of such costs which, if the contract had not been terminated, would have been properly chargeable to the terminated portion of the contract (see subparagraph 3c below). In this respect the accounting treatment used by the contractor in his books and records is not necessarily controlling. However, when costs of the nature discussed in this memorandum are included, additional depreciation or amortization of the same items will be excluded.
*****
d. Particular care should be taken to determine that tooling and other costs are special as defined herein. The bid proposal or other records relating to the negotiation or performance of the contract, which may indicate whether the costs were contemplated by the parties, are important, but not necessarily controlling, evidence that the tooling or other property was acquired or the work done specially for the contract or for the contract and other war production contracts. In the absence of such specific evidence, other satisfactory evidence will be required. In no case will the contractor’s unsupported assertion on this point be considered sufficient, and a representation by the contractor at the time the contract was negotiated that it did not need special tooling or other items for its performance will indicate that such acquisition or cost was not contemplated.
5. Leyde & Leyde’s final termination claim of December 1946, claimed $35,635.01 for these expenses, allocating $24,752.62 to the final nine months of 1944 and $10,882.39 to the first three months of 1945. While Leyde & Leyde’s documentary evidence of the expenditures in question was inadequate and incomplete, it is a reasonable assumption based *293 upon all of the evidence that in the last nine months of 1944 Leyde & Leyde expended the net sum of $7,500 (which includes a deduction of $2,750 representing payments by the Coast Guard and National Inventors Council for two experimental rafts, see footnote 1), and that in the first three months of 1945' Leyde & Leyde spent a sum of $5,500, all of which was properly allocable to the claimed experimental and research expenses under all five contracts. Although many of the research and development expenses alleged by Leyde & Leyde in the final termination claim to have been expended during the pre-contract period in 1944 and 1945 were exaggerated, unreasonable, and not supported in total by the evidence, the proof does not establish that the claiming of them was fraudulent. In its termination claim plaintiff included all of the above experimental and research expense as a charge against the first four contracts and made no apportionment of it to the fifth contract. These expenses are claimed only as to case 49687 relating to the first four contracts and are not claimed in case 49688 relating to the fifth contract (finding 70). Since the fifth contract shared in any benefits derived from the expenditures, a portion of the same should be allocated to it. Allocation of the $13,000 among the five contracts on the basis of 69.08 percent (391/ 566) to contracts MCc-38104-38107, and 30.92 percent (175/566) to contract WSA-9909, results in an allocation of $8,980.40 to the former and $4,019.60 to the latter, which is dealt with in finding 70.
c. The reasonable determination of $13,000 (before allocation among the five contracts) for precontract experimental and research expenses is based in part on the scanty documentary evidence available and in part on reasonable estimates where documentary support is lacking.
d. Leyde & Leyde did not transfer to the government the patent rights acquired as a result of its raft experimentation.
50. General and, Administrative Expenses — $ Up,665.60:
a. In its final termination claim of December 1946, Leyde & Leyde included a schedule of general and administrative expenses totaling $14,665.60, which included all of the claimed expenses of that category for the four contracts assigned to Arlington. A total of 566 rafts was required by the *294 five contracts, including 391 rafts required by the first four contracts. While Leyde’s documentary evidence of the expenditures in question was inadequate and incomplete, it is a reasonable assumption based upon all of the evidence that the general and administrative expenses (excluding certain payments to Rosenberger and Berkeley) of Leyde & Leyde in connection with the five contracts were $7,490.96, of which $5,174.76 represents an allocation of 69.08 percent (891/566) to the four contracts MCc-38104^38107, and the balance of $2,316.20 represents an allocation to the fifth contract WSA— 9909, which is dealt with in finding 69.
b. The determination of $7,490.96 (before allocation among the five contracts) for general and administrative expenses is based in part on the scanty documentary evidence available and in part on reasonable estimates where documentary support is lacking. Certain principles of allowance and disallowance have been adopted, viz:
(1) All expenses pertaining to Leyde’s boats have been excluded because the proof failed to establish the necessity of the boats to contract performance.
(2) Office space in Leyde’s residence has been estimated to be reasonably worth $50 per month for 4% months of contract performance.
(3) The claim for business entertainment, the amount of which was inadequately supported by proof, has been reduced to $350 estimated to be reasonable.
(4) The claim for interest expense during the contract period of $2,042.72 has been reduced to $350 because of the elimination of interest on moneys used for the purchase of the Morgantown property and for the financing of expenditures elsewhere found in this report to have been in excess of the amounts expended for contract purposes.
(5) The claim for traveling expenses has been eliminated because most of it is represented by automobile expenses elsewhere allowed as a general and administrative expense, and the balance is not supported by any facts which would serve as a measure for a reasonable estimate.
(6) The salary claimed for Ardis Leyde has been eliminated because the evidence indicated she performed little or no services during the contract period.
*295 (7) The salary claim of Glen Leyde has been reduced to $4,500 computed at the estimated reasonable amount of $1,000 per month for the 4% months of the contract period.[14]
(8) The claim of $160.10 for the Clarendon Decorating Company has been eliminated because the evidence indicates the services in question consisted of repairs to Leyde’s boats, which expenses had no relation to contract performance.
(9) The claimed payment of $2,000 to Eosenberger for trips made to the plants of subcontractors Gordon and Barry has been eliminated because the weight of the evidence does not establish this to be the fact. However, the evidence does not establish the existence of fraud as defendant contends, since defendant’s evidence is not clear and convincing that these payments were made to Eosenberger for services performed in repairs to Leyde’s home and the Morgantown property.
(10) $40.41 of the claim of $69.76 for insurance is eliminated because it relates to an insurance adjustment concerning the Morgantown property. While it has been found that the Morgantown property was not acquired for a contract purpose, the evidence does not establish that the claim of $40.41 for insurance on the Morgantown property was made with a knowing intent to defraud.
51. Profit:
A reasonable profit allowance to Leyde & Leyde would be 9 percent of amounts allowed for the aggregate of direct materials expense, experimental and research expense, and general and administrative expense.
52. Settlement expenses — $6,000:
a. Settlement expenses are provided for in section 6 (d) of the Contract Settlement Act, which was implemented by Office of Contract Settlement Eegulation No. 5, dated September 30, 1944. This Eegulation amended the “Statement of Principles for Determination of Costs upon Termination of Government Fixed Price Supply Contracts, approved by the Joint Termination Board on December 31, 1943.” The Eegulation provided:
*296 (k) Settlement' expenses: Reasonable accounting, legal, clerical, and other expenses necessary in connection with the termination and settlement of the contract and subcontracts and purchase orders thereunder, including expenses incurred for the purpose of obtaining payment from the Government only to the extent reasonably necessary for the preparation and presentation of settlement proposals and cost evidence in connection therewith.
The Office of Contract Settlement, by Regulation No. 14, provided for the issuance of Termination Cost Memoranda to promote uniformity in the interpretation and application of the Statement of Cost Principles. Termination Cost Memorandum No. 11 was issued July 26,1945, with respect to “Settlement Expenses and Costs of Protection and Disposition of Property.” The Memorandum excluded “(2) accounting, legal, clerical, and other costs and expenses incurred in any appeal, either within a contracting agency or to the Appeal Board of the Office of Contract Settlement, or in any arbitration, mediation or suit in Court, where such proceeding is instituted for the purpose of obtaining payment in excess of the amount the Government has determined to be due * * *.”
b. Plaintiff’s petition contains a claim for settlement expenses in the sum of $6,000. Plaintiff contends that its total settlement expenses were as follows:
Legal services_$2,160. 00
Accounting services_ 1, 903. 00
General expense_ 3, 000. 00
7,063.00
<?. The above claims presented were never submitted to the contracting agency for administrative settlement. The interim claim of the contractor filed in October 1945, made a partial claim of $391 for settlement expenses. In the final claims for all five contracts filed in December 1946, the spaces for the insertion of an amount for settlement expenses were left blank with a notation “to be determined at time of final settlement.”
d. The evidence establishes that Leyde & Leyde’s settlement and appeal expenses total $3,270, consisting of legal fees *297 of $1,050 and accounting fees of $2,220. Of the $1,050 in legal fees, $1,000 related entirely to Leyde & Leyde’s appeal from the adverse decision of the Settlement Review Board. Of the $2,220 in accountant’s fees, $1,831 related to the preparation and filing of the interim and final termination claims, and $389 represented the accountant’s services in connection with Leyde & Leyde’s appeal from the adverse findings of the Settlement Review Board. The proof fails to establish plaintiff’s additional general settlement expense claimed in the amount of $3,000. Substantially all of the legal and accounting fees identified above remain unpaid by Leyde & Leyde.
e. The total settlement expenses enumerated above apply to all five contracts, 69.08 percent thereof (391/566) being allocable to the first four contracts, and the balance being allocable to the fifth contract, which latter is dealt with in finding 72. Of the 69.08 percent allocated to the first four contracts, it is reasonably estimated that one-fourth of that amount related to the preparation and filing of the subcontractor claim of Potomac Enterprises, Inc., which is not the subject of this litigation. Settlement expenses other than those relating to appeal proceedings were $974.54 in the first four contracts and $581.61 in the fifth contract.
53. Interest on borrowings — $9,800:
Arlington is claiming interest on bank loans to June 1, 1949, of $9,800, representing the accrual of interest on the following four then and now outstanding notes:
Date of note or last renewal: Principal amount
January 11, 1946_$20,000.00
January 22, 1946_ 21, 921.92
February 9, 1946_ 10,000. 00
November 18, 1949- 6, 567.34
Total outstanding_ 58,489.26
The only interest paid or owing by Leyde for the use of money in furthering the performance of the contract, during the period of performance, was the $350 referred to in finding 50b (4). The notes of January 11, 1946, February 9, 1946, and November 18,1949, did not represent furtherance of contract performance because they were made long after the period of contract performance and were not renewals *298 of loans made during that period. The note of January 22, 1946, was a renewal of a note made originally during the contract performance period, and any interest accruing thereon during that period, and for a reasonable period after termination, is included in the allowance of $350 interest under general and administrative expenses in finding 505 (4). All other interest claimed on the note of January 22, 1946, accrued after the contract period.
54. a. Payments by defendant to the contractor under the first four contracts exceeded the contractor’s allowable expenses by $5,124.87, arrived at as follows:
Direct materials_$143, 659. 05
General and administrative expense_ 5,416.54
149,075. 59
Profit at 9 percent_ 13,416. 80
162,492.39
Settlement expense_ 974. 54
163,466.93
Payments received_ 168,593.80
Excess of payments over costs_ 5,124.87
5. Defendant has a judgment against Leyde, and against Leyde & Leyde, in the amount of $7,066.61, plus interest at 6 percent from March 29, 1950 (finding 30). No plea of setoff in this or any other amount has been filed by defendant in case number 49687.
Docket No. 49688
CONTRACT WSA-9909
55. On May 21, 1945, pursuant to the Maritime Commission’s invitation to bid of May 9, Leyde & Leyde submitted a bid on 275 fully equipped liferafts for delivery f. o. b., shipside, San Francisco Bay area, California. The bid represented that Leyde & Leyde was a manufacturer and intended to subcontract one-half of any contract awarded. On June 16,1945, the Commission awarded Leyde & Leyde contract WSA-9909 for 175 fully equipped rafts to be delivered f. o. b., San Francisco, at a unit price of $1,300, total $227,500, *299 delivery to be at the rate of 75 rafts per month commencing July 1,1945. This delivery rate contemplated a completion date of September 10,1945.
56. During the pendency of the foregoing bid and prior to the award of the contract, Leyde discussed with the L. D. Reeder Company, of San Francisco (hereinafter “Reeder”), a subcontract to fulfill Leyde & Leyde’s obligations under the prime contract which was expected. On Reeder’s request, Leyde had promised to procure or assist Reeder in the procurement of raft equipment should Reeder have difficulty in obtaining equipment to complete the anticipated subcontract. During the same period Leyde & Leyde negotiated with the Maritime Commission for the purchase from it of a quantity of surplus raft equipment which was stored in the latter’s warehouse or in the equipment manufacturer’s plant.
57. On or about June 15,1945, the Commission shipped to Leyde & Leyde at Falls Church, Virginia, surplus liferaft equipment from Reading, Pennsylvania. The sale was made pursuant to a Potomac Enterprises purchase order at a price of $6,977.02. The original cost to the government of the equipment was $19,362.34. The shipment was paid by the check of Leyde & Leyde drawn to the Commission.
58. On June 16,1945, Leyde wrote the following to Reeder:
We have today been awarded Maritime Commission Contract WSA9909 order #MC45-2733, priority AA1-Symbol M-9 for 175 20 person life rafts delivered ship-side San Francisco Bay area. This contract was given to us as you did not have the approval of the TJ. S. Coast Guard. We are hereby extending to you including all priorities, deliveries, and other contractual terms, conditions and arrangements.
It is mutually agreed that you will be paid as we are paid by the Maritime Commission in a sum equal to $1225.00 per raft leaving $75.00 per raft which is to be retained by us.
Our contract, when received from the Maritime Commission, will contain the provisions of our bid on DGG-1-182 opened May 21,1945, and the terms of forms 4584, Appendix A, and USMC4624, copies of which are enclosed for your guidance.
*300 A copy of the Coast' Guard regulations governing life-rafts is enclosed for your guidance.
59. Because it did not have proper facilities to do the work, Reeder sublet the entire subcontract to Berkeley Steel Construction Company of Berkeley, California (hereafter referred to as “Berkeley”), by purchase order dated June 19, 1945, at a unit price of $1,175 per raft, fully equipped, with a delivery requirement of 36 per month commencing July 5, 1945. Leyde approved the Berkeley subcontract. The fact that the delivery rate under the Berkeley subcontract would not meet the delivery requirements of the prime contract is not explained in the record.
60. Throughout July 1945, Leyde endeavored to negotiate a subcontract directly with Berkeley, which would apparently have superseded the existing Reeder subcontract. These efforts, which were prompted by recommendations of the War Shipping Administration representative to Berkeley, were not consummated.
61. The Commission terminated contract WSA-9909, effective September 5,1945, by telegraphic notice of that date to Leyde. Leyde notified Berkeley the following day.
62. On October 26, 1945, Leyde & Leyde submitted to the Commission, through its firm of accountants, a contract termination claim for $32,906.99 on contract WSA-9909, and an application for a partial payment of $25,000.[15] As heretofore noted (finding 21), the Commission approved a partial payment of $19,000 on November 7, 1945, and the same was paid to Leyde & Leyde on December 12,1945.
63. The administrative and judicial actions taken by Leyde & Leyde and by the Commission in connection with the termination of contract WSA-9909 paralleled and were included in such actions taken in connection with contracts MCc-38104-38107, as set forth in previous findings. These actions included the audit of the termination claims, the 1946 findings of the Settlement Review Board, the appeal therefrom and hearings thereon, rescission of these findings, the criminal trial and acquittal, the civil fraud action and judgment *301 thereon against Leyde, and the findings by the Department of Commerce in August 1950, which adopted the earlier findings of the Settlement Review Board appearing in findings 23,24, and 47 herein. The August 1950 findings of the Maritime Administration of the Department of Commerce were that (a) fair compensation to the prime contractor, for termination of contract WSA-9909 was $2,488.78 and not $32,-906.99 as claimed; (b) the $19,000 partial payment exceeded fair compensation by $16,511.22; (c) the penalty for overstatement was $1,829.59; and (d) the total overpayment plus penalty on the contract was $18,340.81.
64. Plaintiff Leyde is suing as surviving partner of Leyde & Leyde to recover $18,013.40 with appropriate interest, computed by plaintiff as follows:
Cost of direct materials-$24,880.16
General and administrative expense_ 6, 942. 48
Profit_ 1,240.76
Termination settlement expense_ 1, 500. 00
Interest on borrowings_ 2,450.00
37,103.40
Less: Partial payment received_ 19,000.00
Amount of claim_ 18,013.40
65. The above items (except interest on borrowings) were included in the Leyde & Leyde termination claims of October 14, 1945, and December 26, 1946, in the following amounts, excluding claims by subcontractors:

1 To be determined.
*302 A review of the items of plaintiff's claim in suit in the order in which they appear in finding 64, follows in succeeding findings 66 through 73, inclusive.
66. Direct Materials — $24i880.16:
The itemization of the claimed direct materials expense is as follows:

67. Styrofoam:
a,. The principal item of direct materials in plaintiff’s final termination claim was 10,805.1 cubic feet of styrofoam represented in the claim to have cost Leyde & Leyde $16,-207.65, and to be located at Berkeley, California. Leyde & Leyde controlled the procurement of styrofoam because it held W. P. B. allocation orders under the prime contract to procure it from Dow, the manufacturer.
b. On June 29, 1945, Berkeley ordered 9,800 cubic feet of styrofoam from Leyde & Leyde to be shipped in carload lots commencing in early July, at a total cost of $14,700 at $1.50 per cubic foot. On July 3 Berkeley wired Leyde & Leyde to hold up the shipments until further notice, but on July 17 wired Leyde & Leyde again to ship one carload of the styrofoam in July, one on August 5, one on August 15, and the balance in early September.
*303 c. On July 18 Leyde & Leyde notified Dow to ship 9,800 cubic feet of styrofoam to Berkeley, one carload to be sent the following week, one on or about August 5, and the balance about August 15. Leyde & Leyde bought the styrofoam from Dow on its own account, hoping to obtain a profit on the resale to Berkeley of cheaper second and third-grade styro-foam at the $1.50 per cubic foot price of first-grade styro-foam, provided Dow had enough of the lower grades to sell.
d. Although Leyde & Leyde had ordered Dow to ship 9,800 cubic feet of styrofoam to Berkeley, Dow shipped 10,-805.1 cubic feet on the following dates, in the quantities and grades and at the prices shown below, the prices being the cost to Leyde & Leyde:

Later the total cost to Leyde & Leyde was reduced to $12,-785.19, because of the excess shipped without authorization over and above the 9,800 cubic feet ordered by Leyde & Leyde, and Leyde paid Dow that sum in December 1945. The dif-erence of $3,422.46 between $12,785.19, the actual cost to Leyde & Leyde of the styrofoam, and $16,207.65, the amount claimed for the same material in Leyde & Leyde’s final termination claim, is explained by Leyde’s representation that the styrofoam had actually been purchased by Potomac from Dow at the lesser amount and then resold by Potomac to Leyde & Leyde at the greater amount. Not only does the record fail to support any such chain of purchases but also Potomac itself has been found to be an alter ego of Leyde and not a separate entity (findings 42, 44).
*304 e. On August 25, by which time Dow had made two shipments of styrofoam to Berkeley totaling 6,803.6 cubic feet of grades 1,2, and 3, Leyde received Berkeley’s wire of that date to stop styrofoam shipments until further notice. Leyde on the same day telephoned Dow to ship styrofoam to Berkeley according to schedule but to check with Leyde before making further shipments. Also on August 25 Leyde wrote Berkeley, requesting that payment of $14,100 be made by check to Potomac, and informing Berkeley that 9,800 cubic feet of styrofoam in three approximately equal shipments had been shipped on July 27, August 17, and August 23. The representation as to the last shipment being shipped on August 23 was untrue, since this shipment totaling 4,001.5 cubic feet was not shipped by Dow to Berkeley until September 5. Although the evidence of Leyde & Leyde’s contract with Dow is incomplete, it is reasonable to conclude that it was an “open-end” contract, any part of which could have been terminated on reasonable advance notice by Leyde & Leyde to Dow.
/. On September 5 contract WSA-9909 was terminated and Leyde notified Berkeley to that effect. On September 11 Berkeley wired Leyde that it could not accept the third carload shipment of styrofoam which Dow had notified was enroute, but on September 21 Berkeley wired Leyde a modification that it would accept the styrofoam if Leyde would pay freight and all other charges. To this Leyde replied on September 22 that Berkeley should include the freight, storage and handling charges in its termination claim, since these charges had been paid by Berkeley in the meantime (later reimbursed by Leyde), and that Leyde & Leyde would include the styrofoam in its own termination claim.
g. In October 1945, Berkeley requested the Commission’s permission to file its termination claim directly with the Commission instead of submitting it through Leyde & Leyde, as prime contractor. On December 29 this permission was granted. Leyde notified the Commission in writing on January 11, 1946, that he opposed a direct settlement with Berkeley because of Berkeley’s outstanding bills due Leyde & Leyde. Berkeley filed its termination claim with the Commission on January 15, 1946. The claim did not include *305 styrofoam as part of Berkeley’s termination inventory. The Commission advised Leyde on January 17 that it was going to make direct settlement with Berkeley despite Leyde’s objections, and on the same day advised Berkeley that it would accept responsibility for settling its claim directly on certain conditions, which Berkeley later accepted.
h. On January 29, 1946, Leyde wrote the Commission requesting clarification of the Commission’s instructions to Berkeley about the filing of the latter’s termination claim, and reminding the Commission that it had already made Leyde & Leyde a partial payment of $19,000 against net costs which included a large amount for styrofoam sold to Berkeley. On February 5 the Commission advised Leyde that it would receive and consider Berkeley’s separate claim along with Leyde & Leyde’s to insure a just settlement, and that the Berkeley claim did not include the styrofoam item. On February 11 Berkeley sent the Commission a list of equipment on hand at its plant, including 9,800 cubic feet of styro-foam, which it reported belonged to Leyde & Leyde and was not included in Berkeley’s January 15 termination claim.
i. On April 22, 1946, the Commission instructed Berkeley by letter to file its termination claim through Beeder, who, in turn, would file its claim and that of Berkeley with Leyde & Leyde for the latter to file simultaneously with the Commission. The Commission promised, however, to make a direct settlement with Berkeley after considering the claim of the prime contractors and subcontractors together.
j. In May 1946, the Commission commenced to assemble data from Leyde & Leyde and Berkeley which would explain the contractual relationships among Leyde & Leyde, Beeder, Berkeley, and Dow. In September 1946, Berkeley filed a revised claim with the Commission, still omitting a claim for the first two carloads of styrofoam. At or about this time the Commission advised Berkeley that the claim should be revised to include the first two carloads of styrofoam, or 6,514.6 cubic feet,[16] which the Commission contended belonged to Berkeley. Berkeley then filed another revised claim in October 1946, which included a claim of $9,872 *306 (later arithmetically corrected to $9,112) for 6,514.6 cubic feet of styrofoam at $1.50 per cubic foot, plus profit and general and administrative expense allocable to that amount. In March 1947, the Commission paid Berkeley $37,009.05 in settlement of its total termination claim. This sum included $11,467.05, which was attributable to the first two carloads of styrofoam sold to Berkeley by Leyde & Leyde ($9,772 cost of styrofoam,[17] plus allocation of general and administrative expense and profit, plus interest at 2% percent on the total from January 15, 1946, to January 30, 1947).
7c. The Commission sold as termination inventory to a third party for $3,500 the entire quantity of styrofoam which Berkeley had on hand shipped by Bow at Leyde & Leyde’s order. This consisted of three carloads, or 10,805.1 cubic feet, for which Leyde had paid Dow $12,785.19, including 6,803.6 cubic feet which Berkeley had received in the first two carloads, and 4,001.5 cubic feet received in the third carload. Of the $3,500 received by the Commission on the sale of the styrofoam, it allowed $1,173.55 as a disposal credit to Leyde & Leyde in its termination claim. An arithmetically precise allocation to Leyde & Leyde would have been $1,296.40.
1. Berkeley has never paid Leyde & Leyde or anyone for the styrofoam, although receiving payment for the same from the Commission in its termination claim. Nor has Leyde & Leyde filed suit against Berkeley to recover the cost of styrofoam sold to Berkeley.
68. Equipment:
a. Of the $24,880.16 claimed by Leyde & Leyde for direct materials expense in its final termination claim, $16,207.65 represented styrofoam purchases as shown in finding 67, and the balance of $8,672.51 represented raft equipment. Of this raft equipment $5,735.55 constituted equipment represented in the claim to be part of Leyde & Leyde’s terminal inventory at Morgantown, and the remaining $2,936.96 con *307 stituted equipment represented in the claim to be part of Leyde & Leyde’s terminal inventory at Berkeley, California. The Settlement Eeview Board of the Commission had, on November 27, 1946, rejected Leyde & Leyde’s claim of $8,672.51 for equipment in its terminal inventory because of a finding that it was not ordered from Leyde & Leyde by any subcontractors who were manufacturers of liferafts. While this finding was set aside by the Commission in 1947, it was incorporated by the Division of Claims, Maritime Administration of the Department of Commerce, successor agency, in 1950 after filing of this suit (finding 33),
5. The equipment in question had been bought by Leyde & Leyde from the Commission as surplus property on June 9 and 29, 1945, at a cost of $3,334.15, as compared to $8,672.51 claimed in Leyde & Leyde’s final termination claim as cost. The difference of $5,338.36 between the actual cost to Leyde & Leyde and the cost given in the final termination claim is explained by Leyde’s testimony that the equipment had been purchased from the Commission by Potomac for the lesser figure and then resold by Potomac to Leyde & Leyde at the greater figure. Potomac did issue purchase orders to the Commission for the equipment but the record shows that the Commission sold the equipment directly to Leyde & Leyde as purchaser, and was paid by checks of Leyde & Leyde. Potomac, moreover, has been found to be an alter ego of Leyde and not a separate entity (findings 42, 44). Leyde & Leyde purchased the equipment with the intention of making a profit on its resale to any of its several subcontractors who might need it to perform a subcontract. The subcontracts provided that the subcontractors would furnish their own equipment. While neither contract WSA-9909 nor the Reeder subcontract were in existence at the time Leyde was negotiating the purchase of surplus equipment with the Commission, Leyde had reason to believe that one or more of the potential subcontractors would have use for the equipment so purchased.
o. Of the total termination inventory, Leyde claimed that $2,936.96 represented equipment sold to Reeder and shipped to Berkeley. The circumstances of the alleged sale are as follows:
*308 (1) On June 16, 1945, Leyde & Leyde subcontracted contract WSA-9909 to Reeder, and on June 19 Reeder subcontracted it, in turn, to Berkeley, offering to assist Berkeley in obtaining equipment if the latter bad difficulty in obtaining it locally. On June 22 Reeder asked Leyde for information as to the availability of equipment for the rafts to be constructed.
(2) There followed a prolonged exchange of correspondence by letter, telegraph and telephone among Leyde & Leyde, Reeder and Berkeley concerning the equipment, which culminated in a dispute as to whether Berkeley had ordered Leyde & Leyde to supply it. On a basis of all the evidence, particularly Leyde & Leyde’s written offer of the equipment to Berkeley on July 2, 1945, and Berkeley’s telegraphed acceptance thereof on July 25, it is reasonable to conclude that Leyde & Leyde supplied the equipment to Berkeley on what Leyde was justified in thinking was Berkeley’s order, that Leyde & Leyde’s contract to supply the equipment was with Berkeley and not with Reeder, and that the equipment was delivered on or about August 9, 1945, to Berkeley who refused to accept it for delivery.
(3) Although Berkeley refused to accept the equipment on delivery, as stated, it remained in the Berkeley premises and was claimed by Leyde & Leyde in the amount of $2,936.96, although the purchase price to Leyde & Leyde from the Commission had been $1,473. The Commission ultimately disposed of this entire inventory by selling for $455.50 part of it which had cost Leyde & Leyde $690, and by destroying the balance (which had cost Leyde & Leyde $783) on the theory that it was of no value. The Commission credited Leyde & Leyde with $455.50 in its findings for the inventory at Berkeley.
(4) Leyde & Leyde has never filed suit against Berkeley to recover balances allegedly due from the sale of equipment.
d. Of the total termination inventory, Leyde & Leyde claimed that $5,735.55 represented equipment purchased from the Commission as surplus equipment as described in finding 685, and in storage at Morgantown. The cost price to Leyde & Leyde of this equipment on the sale from the Commission was $1,861.15, the difference being accounted for in the same *309 manner as described in finding 685. The Commission removed this equipment from Morgantown to government warehouses in Baltimore, Maryland. The equipment not having been sold, the Commission in December 1946, offered to return it to Leyde & Leyde at the latter’s shipping expense but the evidence reflects neither Leyde’s reaction to the offer nor the equipment’s present whereabouts or subsequent disposition.
69. General and Administrative Expense — $6$1$.1$:
a. Plaintiff’s claim of $6,942.48 for general and administrative expense consists of an apportionment ($5,668.74) to contract WSA-9909 of a total claimed expense of that category allocable to all five prime contracts. In addition, plaintiff claims reimbursement for $1,000 paid Bosenberger on August 14,1945, and $273.74 paid Berkeley for freight and demurrage, an overall total of $6,942.48.
5. The general and administrative expense allocable to all five prime contracts (excluding the Bosenberger and Berkeley payments) has been found to be $7,490.96,[18] of which $2,316.20, or 30.92 per cent is allocable to the fifth contract, WSA-9909 (finding 50).
c. The claim of $1,000 paid to Bosenberger is not found to be allocable to the contract for the reasons set forth in paragraph (9) of finding 505.
d. Leyde & Leyde had reimbursed Berkeley $273.74 for freight charges paid by the latter in connection with the third carload of styrofoam shipped by Dow to Berkeley (finding 67/). In settling Berkeley’s termination claim the Commission paid Berkeley again for this expense, despite Leyde & Leyde’s reimbursement to Berkeley. The freight expense of $273.74 is allocable to Leyde & Leyde’s claim under contract WSA-9909 to the same extent as Leyde & Leyde’s claim for payment for the third carload of styrofoam under the circumstances described in finding 67.
70. Experimental and research expense:
Plaintiff Leyde & Leyde makes no claim for experimental and research expense in connection with contract WSA-9909. Plaintiff Arlington in docket number 49687, reported herewith, claimed total precontract experimental and re *310 search expense of $35,635.01, of which $13,000 has heretofore in this report (finding 49) been found as a fair and reasonable amount. Plaintiff Arlington, however, made no allocation of the total expense among the five contracts. The portion of the $13,000 experimental and research expense theoretically allocable to contract WSA-9909 is $4,019.60 (finding 49&).
71. Pro-fit:
A reasonable profit allowance to Leyde & Leyde would be 3.899 percent[19] of amounts allowed for the aggregate of experimental and research expense, direct material expense, and general and administrative expense.
72. Settlement expense:
As stated in finding 52e, the settlement expenses, other than expenses of appeal proceedings, allocable to contract WSA-9909 are $581.61. The governing regulations and facts are recited in finding 52.
73. Interest on Borrowings:
a. In its final termination claim under contract WSA-9909, plaintiff made no claim in a dollar amount for interest on borrowed money, but inserted the statement instead that interest was “to be determined at time of final settlement.” Interest of $2,450 to June 1,1949, is claimed in the petition. For the reasons stated in finding 53, the borrowed moneys on which this interest is claimed were not related to contract performance.
74. Payments by defendant to the contractor under the fifth contract exceeded the contractor’s allowable expenses by $913.35, arrived at as follows:
Direct materials_$14,258.19
General and. administrative expense_ 2,589.94
16, 848.13
Profit at 3.899 percent_ 656.91
17,505.04
Settlement expense_ 581.61
18, 086.65
*311 Payments received_$19,000.00
Excess of payments over costs_ 913.35
STATUTORY INTEREST ON CLAIMS
75. a. In addition to the claims under contracts MCc-38104-38107 by plaintiff Arlington summarized in finding 45, and those under contract WSA-9909 by plaintiff Leyde summarized in finding 64, each plaintiff demands interest on amounts found due at 2% percent per annum from September 23, 1945,[22] to date of payment, pursuant to section 6 (f) of the Contract Settlement Act.
b. Relevant provisions of section 6 (f) of the said Act are :
Each contracting agency shall allow and pay interest on the amount due and unpaid from time to time on any termination claim under a prime contract at the rate of 2y2 per centum per annum for the period beginning thirty days after the date fixed for termination and ending with the date of final payment, except that
(1) if the prime contractor unreasonably delays the settlement of his claim, interest shall not accrue for the period of such delay,
‡ $ $ $ $
(3) if after delivery of findings by a contracting agency the contractor appeals or sues as provided in Section 13, interest shall not accrue after the thirtieth day following the delivery of the findings on any amount allowed by such findings, unless such amount is increased upon such appeal or suit.
o. There is no evidence that plaintiff unreasonably delayed the settlement of its claim.
*312 dependant’s COUNTERCLAIM IN DOCKET NUMBER 49688
76. By its counterclaim filed to the petition in Docket Number 49688 defendant demands judgment against plaintiff in the sum of $18,340.81, plus interest from December 12,1945, based on an alleged overpayment of Leyde & Leyde’s original termination claim filed in October 1945, under contract WSA-9909. On December 12, 1945, defendant made a partial payment of $19,000 to Leyde & Leyde against the latter’s termination claim which listed contract expenses and profit totaling $32,981.99 (findings 62, 63). The $18,340.81 counterclaimed by defendant consists of an alleged overpayment of $16,511.22, plus a penalty of $1,829.59 exacted pursuant to section 8 (d) of the Contract Settlement Act, which reads in pertinent part:
In case of an overstatement by any war contractor of the amount due on his termination claim or claims in connection with any interim financing under this Act, such contractor shall pay to the United States as a penalty, an amount equal to 6 per centum of the amount of the overstatement, * * *. Any penalty may be deducted from any amounts due the war contractor upon such termination claim or claims, or otherwise, or may be collected from the war contractor by suit * * * and shall constitute a debt due the United States within the meaning of Revised Statutes 3466 (31 U. S. C., sec. 391).
77. Defendant’s allegation of overpayment is predicated upon the difference between the amounts appearing in Leyde & Leyde’s original termination claim of October 1945, on contract WSA-9909, and the 1946 findings of the Maritime Commission Settlement Review Board, which latter were set aside by the Commission in 1947, and subsequently adopted by the Maritime Administration of the Department of Commerce in 1950 after the instant suit was filed. The following schedule presents the necessary accounting details:

*313

78. The determination of whether defendant’s partial payment of $19,000 to Leyde & Leyde on December 12, 1945, resulted in an overpayment depends upon the resolution of the costs properly allowable to Leyde & Leyde under its termination claim as these facts are presented in findings 55 through 73. Defendant in its counterclaim has failed to credit plaintiff with the following disposal credits, although the Settlement Review Board in its 1947 findings so credited Leyde & Leyde:
1. Credit for sale price of claimed termination inventory removed from Morgantown_$4,253.21
Less freight_ 128.37
- $4,124.84
2. Credit for sale price of claimed inventory sold at Berkeley, Calif.:
Styrofoam_ 1,173.55
Equipment_ 455.50
- 1,629.05
5,753.89
107.92 Less freight on claimed termination inventory removed from Morgantown and unsold.
5,645.97
*314 defendant’s cross-claim
79. a. In docket number 49688 defendant filed a third-party petition against Berkeley seeking recovery of moneys paid Berkeley in its termination claim for styrofoam. The facts upon which the claim is based are set forth in detail in finding 67. Defendant seeks a contingent judgment against Berkeley for any amount which the court may award plaintiff Leyde for two carloads of styrofoam claimed by Leyde & Leyde and Berkeley separately in their termination claims as part of their inventories, and paid by defendant to Berkeley.
5. In addition, defendant asks judgment against Berkeley for $1,500, alleged to be the difference between the amount paid Berkeley by defendant for the two carloads of styro-foam, and the actual cost of the styrofoam from Dow, its manufacturer-supplier. The correct difference between these figures, including allocated profit and general and administrative expenses, and interest, is $1,395.10 (see finding 67j and footnote 19 for computation).
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgments herein, the court concludes as a matter of law that the plaintiff, Arlington Trust Company, Incorporated, Assignee of Leyde & Leyde, a Partnership, in case number 49687, and plaintiff, Glen W. Leyde, in case number 49688 are not entitled to recover, and their petitions are therefore dismissed; that the defendant is not entitled to recover on its cross claim against the third party defendant, Berkeley Steel Construction Company, in case number 49688, and said cross claim is therefore dismissed; and that the defendant is entitled to recover on its counterclaim against Glen W. Leyde in case number 49687, and it is therefore ordered and adjudged that defendant recover of and from Glen W. Leyde the sum of nine hundred and thirteen dollars and thirty-five cents ($913.35).

 These test rafts were ultimately disposed of piecemeal by sale, dismantlement and reuse of parts, and by wreckage. Two test models were sold, one to the Coast Guard for $1,800 and one to the National Inventors Council for $950.

 The tabulation does not include the rafts called! for under contract WSA-9909, which was let on June 16, 1945, and Is the subject of later findings In case No. 49688.

 Including 16 which, at termination, were substantially completed and, under Commission instructions, were subsequently completed and delivered.

Simultaneously a termination claim and partial payment application, was filed by Leyde & Leyde under a fifth contract, WSA-9909 (see finding 62). This claim as well was marked as an “interim” claim prepared on a total cost basis.

 Except the subcontractor claim of Potomac, as will appear.

 United States v. Leyde & Leyde, 89 F. Supp. 256.

 Claim P-1561 was tlie agency’s number for the termination claim of Leyde & Leyde under contracts MCc-38104-38107, which predicates the instant suit by Arlington, while P-1562 relates to the claim of' Leyde under contract WSA-9909, on which Leyde is suing.

 Herein shortened to “Morgantown.” Expenses relating to the acquisition and maintenance of Morgantown were not included in Leyde & Leyde’s final termination claim of December 1946, or in the instant suit by Arlington. The sole purpose of the findings here on Morgantown is to establish whether it had any reasonable relation to the performance of the raft contracts, since a large part of the moneys loaned by Arlington to Leyde & Leyde under the assignments was used for the purchase of Morgantown, and not for direct payments for rafts or raft components. Of course, interest on these borrowed sums is included in the instant suit by Arlington.

 Leyde testified that the Leyde & Leyde account at Arlington was used by Potomac for deposits and withdrawals, but no signature card was on file at Arlington from Potomac, and the record of Potomac transactions in that account dispels any doubt as to Potomac being a separate entity. Habitually ,the account records “wash” transactions where a Leyde & Leyde check drawn to Potomac in payment of an alleged purchase would be deposited in the Leyde & Leyde account, while checks drawn by Potomac on the Leyde & Leyde account, payable to Leyde or his wife for salary, were deposited in the Leyde & Leyde account.

 The Commission ultimately found that Leyde & Leyde was entitled to a net disposal credit of $4,124.84 for terminal inventory which was delivered by Leyde to the Commission and sold by the latter. The adequacy of the disposal credit cannot be determined from the record, although it is apparent that the Commission sold only a part of the terminal inventory and made no visible accounting or credit for a number of additional inventory item® which Leyde had delivered to it. The disposal credit allowed by the Commission was never paid Leyde & Leyde but simply charged against a larger indebtedness which the Commission claimed was due from Leyde & Leyde (finding 24).

 Leyde & Leyde ordered ration sets from a supplier but refused to accept delivery and never paid for them. The supplier’s direct claim- to the Commission was refused and he never pursued Leyde. Leyde claimed to have ordered them from Potomac for $11,016, which, in turn, had purportedly ordered them from the supplier for $9,180. The orders to and from Potomac were not bona fide.

This styrofoam was bought by subcontractor Barry from Leyde & Leyde which had bought It from Dow, was included in Barry’s termination claim, and was paid for by the Commission. Leyde’s claim that it was includable in Leyde & Leyde’s terminal inventory in Brooklyn was in error. Moreover, the actual cost of the styrofoam in question was $132, and not $660 as claimed.

 Such as $187.65, representing the cost price to Leyde & Leyde of surplus equipment bought by it from the Commission and resold to Gordon. Gordon later was paid for this equipment by the Commission in his termination claim. Leyde & Leyde’s claim would have apparently been against Gordon, but there is no record that it pursued Gordon to collect it. Nor Is there any evidence in the record' that Gordon paid Leyde & Leyde for this equipment.

 Leyde’s salary was not actually paid in the amounts claimed or any other amounts. Salary checks, many of them backdated, were drawn on the Leyde & Leyde account to Leyde, and immediately redeposited back into the same account.

 These were submitted simultaneously with the termination claim under contracts MCc-38104-38107 (finding 20a). The 532,906.99 was a net figure after a 875 disposal credit. The claim itself was marked as an “interim” claim.

The first two carloads actually totaled 6,803.6 cubic feet. The reason for the discrepancy is not known.

 The computation of $9,772 apparently comprehended that all of the styro-foam was first grade quality at a price of $1.50 per cubic foot. Actually, since parts of the first two shipments of a styrofoam were second- and third-grade styrofoam which Dow sold to Leyde & Leyde at a lower price, the actual cost to Leyde & Leyde of the first two shipments of styrofoam was $8,583.12. The Commission, apparently in error, paid Berkeley at the rate of $1.50 per cubic foot for the entire amount, as though it were all first-grade styrofoam.

“ Instead of $18,334.34 as claimed.

“Profit of 9 percent was found herein to be reasonable as to contracts MCc — 38104-38107 (finding 51). Plaintiff’s suit on contract WSA-9909 claims profit of 3.899 percent.

 The dates 30 days after dates of termination of the separate contracts were as follows:

Note that the demand of plaintiffs is, in part, for interest at 214 percent on the interest accruing after termination date plus 30 days on moneys borrowed.